THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RAYMOND COSTELLO, Defendant-Appellant.

First District (2nd Division)    No. 80-589

Opinion filed April 21, 1981.

James J. Doherty, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Alexander Vroustouris, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Defendant, Raymond Costello, was charged by indictment with one count of attempt armed robbery, two counts of aggravated battery and one count of armed violence. Upon motion by defendant the charge of armed violence was dismissed. Following a bench trial defendant was found guilty of one count of aggravated battery and of attempt armed robbery. Defendant was sentenced to the Illinois Department of Corrections for concurrent terms of six years for attempt armed robbery and five years for aggravated battery. Defendant appeals contending that (1) he was not proved guilty of aggravated battery beyond a reasonable doubt because the State failed to prove that great bodily harm was inflicted upon the victim; (2) that he was denied a fair trial "when the judge assumed the role of prosecutor by interrogating the witnesses"; (3) that his "sentences are improper as a penalty for refusing to admit guilt"; and (4) that he was entitled to be sentenced to the Juvenile Division of the Department of Corrections.

For reasons hereinafter set forth, we affirm the judgment of the circuit court of Cook County.

On March 2, 1979, at approximately 10:30 p.m. Officer Timothy Goc and his partner, Officer Zolig, both in plain clothes, were on patrol in an unmarked vehicle. As they proceeded south on Hoyne Avenue and approached Cermak Road, a well-lit area, Officer Goc observed three individuals running into a parking lot which was also well lit. At that time the victim, Audelio Arteaga, returning to his automobile which was parked in a food store parking lot at the corner of Hoyne Avenue and Cermak Road, observed three individuals walking toward him. As Arteaga was entering his automobile, the three men "prevented [him] from closing the door" and "started to beat [him]." As the officers entered the parking lot, Goc observed the "three youths trying to get, drag or pull a guy out of a vehicle."

The three men demanded Arteaga's money and although Arteaga told them he would give them his money, they continued to beat him. One of the three men, lighter complected than the others, wore a blue jean jacket and blue jeans, and had a blackjack, which he used to strike Arteaga "in the nose and on the face." Arteaga had an opportunity to see this man's face and subsequently identified him as the defendant. The other two were also hitting him "in the head." Arteaga could not protect himself because "they held [his] hands" and "would not let [him] move" his head. Approximately 30 seconds after the three began beating him, the police arrived.

As the officers proceeded closer to the parked automobile, Goc observed "the three individuals beating the individual that was in the vehicle with their fists and one individual had a black object in his hand."

The officers exited their car and announced their office. Two of the three men ran away, and Officer Goc began chasing them. The other one was apprehended at the car. An officer asked Arteaga what had happened, and Arteaga told the officer that he had been hit and asked for money. The officer asked Arteaga for a description, but he was unable to respond because he "was extremely nervous." However, he did tell the officer that one of the offenders was lighter complected.

Officer Steven Scholl and his partner, Officer Eason, both in plain clothes, received a radio call at approximately 10:30 p.m. requesting assistance at Hoyne Avenue and Cermak Road. Upon their arrival, Officer Zolig informed them that Officer Goc was "chasing a youth down the street." As Officer Goc followed the two men through the parking lot to Hoyne Avenue, the two took different paths. Officer Goc followed the man wearing the blue jean jacket and blue jeans who was subsequently identified by him as the defendant. Defendant ran south on Hoyne Avenue. When defendant reached 22d Place, he turned the corner. Officer Goc was approximately 15 feet behind defendant and briefly lost sight of him. As Officer Goc turned onto 22d Place, he saw defendant "stopped by a house and a gangway" and looking toward him. Defendant walked down the concrete stairs leading to the gangway. When Officer Goc reached the stairs, he observed defendant go through the gangway and into the backyard, and then lost sight of defendant. Officer Goc waited for assistance before further pursuing defendant.

When Officer Scholl arrived, Officer Goc informed Scholl that he was looking for a 17-year-old light-complected Latin male wearing blue jeans and a blue jean jacket who was "somewhere in the backyard, in the gangway." Officer Scholl proceeded through the gangway while Officer Goc proceeded through the gangway to the left. Officer Scholl, using a flashlight, noticed a snow pile and observed an individual, subsequently identified as defendant, wearing blue jeans and a blue jean jacket "curled up in a ball laying on the ground." Officer Scholl identified himself and told defendant to stand up. When Officer Goc reached the backyard, he heard Officer Scholl yell, "I got him." Officer Goc stated, "yes, that's the one I was looking for." As Officer Scholl was handcuffing defendant, he noticed a blackjack on the ground approximately three feet from where defendant had been lying. Officer Scholl informed Officer Goc that he had found the blackjack, which Goc recognized.

Officers Goc and Scholl took defendant back to the parking lot, where Arteaga recognized defendant as the man who had beaten him with the blackjack. Arteaga also recognized the blackjack. Later that evening Arteaga identified defendant in a lineup at the police station. The following day Arteaga sought treatment at a clinic. He testified that the beating "broke my nose, and they hit me on the head also, and I lost a

tooth, it came loose." Arteaga further testified, "I still bleed now and then from the nose."

Defendant testified that he was arrested on March 2, 1979, by a police officer in an alley near 22d Place while he was walking from a bus stop to his home at 2016 Coulter, approximately two blocks from Hoyne Avenue and Cermak Road. Defendant explained that he had been with a friend, Alex Aguilar, and had walked Aguilar to a bus stop at the corner of Bell Avenue and Cermak Road. After Aguilar boarded the bus, defendant started for home and took a short cut through the alley. The officer who arrested him told him to stop and when he did so, the officer grabbed him, yelling "I got him." Defendant denied seeing Arteaga that night and denied beating Arteaga with a blackjack or asking him for money.

## I

Defendant contends that he was not proved guilty of aggravated battery beyond a reasonable doubt because the State failed to prove that great bodily harm was inflicted upon the victim. The defendant was charged with and convicted of aggravated battery which is defined by section 12—4 of the Criminal Code (Ill. Rev. Stat. 1977, ch. 38, par. 12—4) as follows:

> "(a) A person who, in committing a battery, intentionally or knowingly causes great bodily harm, or permanent disability or disfigurement commits aggravated battery."[1]

■■■ The term "great bodily injury" referred to as an essential element of the offense of aggravated battery is not susceptible of a precise legal definition but it is an injury of a graver and more serious character than an ordinary battery. (*People v. Carmack* (1977), 50 Ill. App. 3d 983, 986, 366 N.E.2d 103.) It has been repeatedly held that whether a particular injury constitutes great bodily harm is a question of fact. (*People v. Rickman* (1979), 73 Ill. App. 3d 755, 391 N.E.2d 1114; *People v. Carmack; People v. Hunter* (1973), 14 Ill. App. 3d 879, 303 N.E.2d 482; *People v. Meeks* (1973), 11 Ill. App. 3d 973, 297 N.E.2d 705.) The question is not what the victim did or did not do to treat the injury inflicted but what injuries he did in fact receive. (*People v. Carmack* (1977), 50 Ill. App. 3d 983, 985.) Moreover, the law in Illinois recognizes that a physical beating may qualify as such conduct that could cause great bodily harm. *People v. Baker* (1975), 31 Ill. App. 3d 51, 58, 334 N.E.2d 249.

At oral argument defendant conceded that the injuries which Arteaga testified he sustained, if actually sustained, are sufficient to constitute

---

[1] Battery is defined by section 12—3 of the Criminal Code (Ill. Rev. Stat. 1977, ch. 38, par. 12—3) as follows:

"(a) A person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual ° ° °."

great bodily harm.[2] However, defendant contends that the State failed to prove beyond a reasonable doubt that Arteaga actually sustained these injuries. In a bench trial in a criminal case, it is for the trial court to hear the testimony and determine the credibility of the witnesses. Where the truth lies is a matter peculiarly for the trier of fact, and it is not for a reviewing court to substitute its opinion therefor. (*People v. McNair* (1979), 71 Ill. App. 3d 782, 788, 390 N.E.2d 142.) A reviewing court will not disturb a guilty finding unless the proof is so unsatisfactory or implausible as to justify a reasonable doubt as to the defendant's guilt (*People v. Charleston* (1970), 47 Ill. 2d 19, 22, 264 N.E.2d 199), or where the evidence of the prosecution is improbable, unconvincing or contrary to human experience. *People v. Poltrock* (1974), 18 Ill. App. 3d 847, 850, 310 N.E.2d 770.

In support of his contention that the State failed to prove that Arteaga sustained a broken nose and lost a tooth, defendant relies upon *People v. Eichelberger* (1980), 81 Ill. App. 3d 1012, 401 N.E.2d 1208. In *Eichelberger* the court, in reversing defendant's conviction, reasoned at page 1015:

> "Reviewing the record, we find that the testimony of Charles Prather, Jr., was so implausible and contrary to human experience as to cast reasonable doubt of defendant's guilt. We are not convinced that Prather sustained a broken nose or facial injury. Although Prather testified at trial that his nose had been bleeding and was 'real sore,' the injury was not apparent to the police officer who arrived on the scene shortly after the incident. It is equally implausible that, having sustained a broken nose, Prather was not taken to the hospital to have his nose examined until five or six hours after the incident. *We also find it doubtful that Prather was punched in the face since, when questioned by the police officer, he merely stated that he had been pushed or shoved.* The fact that the complaint for battery was not signed until May 17, 1978, approximately 1½ months after the incident also casts grave doubt upon Prather's credibility." (Emphasis added.)

It is our opinion that *People v. Eichelberger* is factually distinguishable from the case at bar. Unlike the victim in *Eichelberger,* Arteaga's testimony is clear and convincing. Arteaga testified that defendant struck him "in the nose and on the face" with a blackjack. Officer Goc observed three men beating Arteaga "with their fists" and that defendant had "a black object in his hand." Arteaga's testimony that as a result of the beating by defendant he suffered a broken nose, which "still bleeds now

---

[2] We note that in *People v. Smith* (1972), 6 Ill. App. 3d 259, 264, 285 N.E.2d 460, the court upheld a conviction for aggravated battery where the defendant "struck the complainant twice in the face with his fist, gave her a lump in her mouth, put a scar on her face, and left bruises under the chin." In *People v. Rickman* a broken ankle was held sufficient to constitute great bodily harm.

and then" and lost a tooth, is also clear and convincing. There is substantial evidence in the case at bar from which the trial judge could properly have found that Arteaga sustained injuries of the nature required by statute.

Defendant also argues that the lack of prompt medical attention "shows doubt that great bodily harm was inflicted." As we previously noted, the question is not what the victim did or did not do to treat the injury inflicted but what injuries he did in fact receive. (*People v. Carmack* (1977), 50 Ill. App. 3d 983, 985.) In *People v. Carmack* the injury inflicted was found to be great bodily harm even though the victim did not seek medical attention until three days after the incident, and in *People v. Newton* (1972), 7 Ill. App. 3d 445, 287 N.E.2d 485, the injury inflicted was also found to be great bodily harm even though the victim had initially gone to the hospital but left and went to his own doctor's office because the hospital was busy. The trial judge's finding with regard to the nature and extent of the injuries suffered by Arteaga is not so implausible or contrary to human experience as to suggest reversal.

## II

■■ Defendant also contends that he was denied a fair trial because "the trial judge assumed the role of prosecutor by interrogating witnesses." It is clear that a trial judge has the right to question witnesses in order to elicit the truth or to bring enlightenment on material issues which seem obscure (*People v. Palmer* (1963), 27 Ill. 2d 311, 314, 189 N.E.2d 265; *People v. Wesley* (1959), 18 Ill. 2d 138, 155, 163 N.E.2d 500), or to clarify ambiguities in the witness' testimony (*People v. Rogers* (1974), 18 Ill. App. 3d 940, 943-44, 310 N.E.2d 854). The propriety of such examination must be determined by the circumstances of each case and rests largely in the discretion of the trial court. (*People v. Palmer* (1963), 27 Ill. 2d 311, 315; *People v. Trefonas* (1956), 9 Ill. 2d 92, 100, 136 N.E.2d 817.) This is especially true where the cause is tried without a jury and the danger of prejudice lessened. *People v. Palmer* (1963), 27 Ill. 2d 311, 315.

■■ We have carefully examined all the questions by the trial judge as shown by the record and find that they did not exceed the bounds of propriety. The trial judge posed only one question to Officer Goc. He asked how many individuals had been apprehended. The trial judge asked Arteaga his nationality and further asked if Arteaga knew the nationality of defendant. The inquiries addressed to Officer Scholl dealt with a physical description of the area where the officer testified he had apprehended the defendant. The trial court also questioned the defendant as to where he had been before he was arrested and where he resides.[3] It

---

[3] Defendant had previously testified he had left a bus stop and was on his way home when arrested.

is our opinion that the trial judge's inquiries were appropriate to his role as a finder of fact. (*People v. Palmer* (1963), 27 Ill. 2d 311, 315; *People v. Wesley* (1959), 18 Ill. 2d 138, 155.) Moreover, during oral argument defendant conceded, albeit reluctantly, that the trial judge did not, in fact, conduct examination. We cannot, therefore, conclude that the trial judge abused his discretion in asking these questions. Nor do these questions evidence that the judge had discarded his role of impartiality.

### III

Defendant also contends that the trial judge "improperly penalized [him] for failing to admit the immorality of his act and show remorse." At the sentencing hearing the trial judge made the following remarks upon which defendant bases his argument that the judge considered improper factors in imposing sentence:

> "Well, it's tragic to see you waste your life really. Really tragic to see a citizen out in the parking lot getting his brains beat out with a black jack and you don't even know what he's got. Tragic all the time and labor put in a system for your benefit.
>
> Mr. Coleman knows you personally. And I say this to you, not viciously, vindictive, I don't feel that way. I really feel sorry for you, because your mind is not right. You stand here and your mind is not right. And I generally feel it's a matter of mind. You don't have any remorse for having broken that man's nose. And you really have no awareness of the imorality [*sic*] of what you did.
>
> Hopefully you have some idea, some concept of the stupidity. If society were such that you just walked around and don't work and won't have to make any contributions, just taking what you want, wouldn't be anybody working. It would be a jungle. All you have to do to get fifteen, twenty dollars is walk up, hit somebody with a black jack. And if that's the way the people lived, earned a living, nobody would have any money in their pockets, would they.
>
> Here's a man you have never seen before in your life. Just pick him out on a parking lot, start beating on him. Had a chance to talk to him, learn his name, identity, you might end up being the best of friends."

In light of these comments defendant argues that this practice penalizes the defendant who continues to assert his innocence after conviction and may result in an added penalty.

We agree with defendant that it is improper to enhance a defendant's sentence just because he maintains his innocence at sentencing. (*People v. Coleman* (1980), 83 Ill. App. 3d 429, 434, 403 N.E.2d 1266, 1270; *People v. Porter* (1980), 83 Ill. App. 3d 720, 721, 404 N.E.2d 337, 338; *People v. Sherman* (1977), 52 Ill. App. 3d 857, 859, 368 N.E.2d 205.) However, we

are satisfied that this did not occur here. The present case is unlike *People v. Sherman* upon which defendant relies, where the trial court told the accused, " 'the one thing that I can say about Mr. Williams [a co-defendant] is that he admitted his guilt to the probation officer,' " and then again referred to Williams' admission of guilt as an "indication that perhaps he [Williams] is taking the first step toward rehabilitation." The trial court here neither asked defendant to admit his guilt nor offered him a lesser sentence if he did. In *People v. Moffett* (1977), 55 Ill. App. 3d 939, 371 N.E.2d 364, the Appellate Court for the Third District explained that its decision in *Sherman* was due to unusual facts. In *Moffett* the trial court at sentencing stated "that for whatever reason the defendants still persist in their innocence." Nonetheless that appellate court in *Moffett* concluded at page 941 that upon a review of the entire record it was evident that this did not influence sentencing because "[t]he implication of better treatment on sentencing found in *Sherman* [was] not present * * *." Moreover, in *People v. Coleman* (1980), 83 Ill. App. 3d 429, 434, 403 N.E.2d 1266, 1270, the trial court noted at the sentencing hearing that " '[t]he defendant has assumed an attitude of innocence, and has not indicated any real remorse or sorrow for the crime he has committed.' " Nevertheless, the appellate court, upon a review of the record, did "not agree with defendant that this statement suggests his nine-year sentence was in part a penalty for maintaining his innocence."

■■ In *People v. Porter* (1980), 83 Ill. App. 3d 720, 721, 404 N.E.2d 337, the trial court stated:

> " 'Mr. Porter, I think it's commendable you have voluntarily set up a course of educating yourself. I think in the long run this is to be advantageous to you. However, Mr. Porter, the court felt the evidence was overwhelming that you did commit the burglary in this one van. Just now, on the stand, under oath, you indicated that you are not guilty of that offense. There, of course, is not remorse. No statement that it would not happen again.' "

Nonetheless the appellate court at pages 721-22 concluded that the statement was similar to the statement in *Moffett* and that "the record shows that the court did no more than address the factor of remorsefulness as it bore upon defendant's rehabilitation." A review of the record supports defendant's conviction of aggravated battery and attempt armed robbery beyond a reasonable doubt and establishes that he used a blackjack in carrying out the offenses. The trial court also heard the testimony of defendant's parole officer who testified that defendant "had been sent to the Department of Corrections at St. Charles at least three times." The sentences were within legal limits, and we cannot say that the trial court abused its considerable discretion in sentencing. (See *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541; *People v. Perruquet* (1977), 68

Ill. 2d 149, 368 N.E.2d 882.) Based upon the foregoing, we cannot conclude that defendant's sentence was enhanced because he maintained his innocence at sentencing.

## IV

■ Defendant finally contends that the cause must be remanded to provide for defendant's sentencing to the Juvenile Division of the Illinois Department of Corrections. Defendant argues that because he was 16 years of age when the offenses were committed, he should have been sentenced to the Juvenile Division rather than the Adult Division. The record discloses that defendant was 17 years old at the time of trial. Section 5—8—6(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—6(c)) provides:

> "All offenders under 17 years of age sentenced to imprisonment shall be committed to the Juvenile Division of the Department of Corrections * * *."

Defendant, relying upon *People v. Ray* (1977), 51 Ill. App. 3d 748, 366 N.E.2d 960, would have us interpret this as all persons under 17 years of age at the time they commit an offense for which they are subsequently sentenced to imprisonment. However, in *People v. Taylor* (1979), 76 Ill. 2d 289, 310, 391 N.E.2d 366, our supreme court interpreted the language of section 5—8—6(c) as " 'all offenders under 17 years of age when sentenced to imprisonment * * *.' (See *People v. Walker* (1978), 61 Ill. App. 3d 891, 897.)" The court concluded that the offender's age when sentenced is therefore the relevant criterion.

In his reply brief defendant argues that "*Taylor* was not decided until June 8, 1979 and the crime here occurred March 2, 1979. At that time *Ray* was in effect and so defendant could be sentenced under the statute construed by *Ray* effective at the time of the crime." Defendant's argument, however, fails to take cognizance of *People v. Walker* (1978), 61 Ill. App. 3d 891, 378 N.E.2d 607, which our supreme court noted with approval in *Taylor*. The *Walker* court disagreed with the reasoning of the *Ray* court and held that whether a defendant must be committed to the Juvenile Division under section 5—8—6(c) is to be determined by the defendant's age at the date of sentencing. Accordingly, we conclude that defendant, who was 17 years of age at the time he was sentenced, was not entitled by section 5—8—6(c) to be sentenced to the Juvenile Division of the Illinois Department of Corrections.

Based upon the foregoing, we affirm the judgment of the circuit court of Cook County.

Affirmed.

HARTMAN, P. J., and STAMOS, J., concur.