THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TOMMY NEVITT, Defendant-Appellant.

First District (3rd Division)   No. 86—1993

Opinion filed August 24, 1988.

Mary Ellen Dienes, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, Anthony J. Carballo, and Catharine M. Forest, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Tommy Nevitt, was convicted by a jury of aggravated criminal sexual assault (Ill. Rev. Stat., 1984 Supp., ch. 38, par. 12–14(b)(1)). The trial court sentenced him to 18 years' imprisonment. Defendant appeals and raises the following contentions: (1) defendant was not proven guilty beyond a reasonable doubt and the trial court erred in denying his motion for a directed verdict where the State's evidence failed to corroborate defendant's confession; (2) defendant was denied a fair and impartial trial where the trial court erroneously showed favoritism toward the prosecution and bias against the defense; (3) defendant received ineffective assistance of counsel where his counsel failed to object to inadmissible evidence and failed to introduce medical evidence to show the victim was not sexually abused; (4) the prosecutor's closing argument to the jury was unduly prejudicial and denied defendant a fair trial; and (5) the 18-year sentence is excessive.

For the reasons stated below, we reverse the judgment of the circuit court.

The record indicates the following. Pamela testified that she is the mother of the alleged victim, a boy 3½ years old at the time of the alleged incident. On August 27, 1984, around 7:30 a.m., Pamela

bathed her son and as part of her daily routine, checked the boy's body, including his genital area. Pamela found no unusual conditions on the boy's body. After dressing, the mother and son went to the Accounters Community Day Care Center at 81st Street and Racine Avenue in Chicago, approximately two blocks from their home. The boy had been attending the center for seven to eight months. Pamela took her son to his classroom and gave her son's hand to his teacher, Tommy Nevitt, the defendant. Pamela identified defendant at trial as that teacher.

Around 3 p.m. on August 27, 1984, Pamela returned to the day care center to pick up her son. The boy was sitting in the lobby with other children. He was not talking and said nothing to his mother when he saw her. Pamela took her son to her car, and they both got in. The boy said nothing. Pamela testified that her son's behavior was unusual, since he normally kisses her and talks to her. Instead, the boy was "withdrawn."

When they arrived home, Pamela and her son went to the kitchen of their second-floor apartment. The boy sat at the table, and Pamela gave him a cupcake, his usual afternoon snack. Pamela stated that normally, her son "devour[s]" the cupcake. On that day, however, the boy merely "picked at" the cupcake. Pamela left the kitchen for about two minutes. When she returned, the boy was still sitting quietly, slowly eating the cupcake. Pamela then asked the boy what was wrong. The boy blurted out, "Teacher Tony, bit my dingdong." At trial, the prosecutor asked Pamela if she knew someone by the name of "Teacher Tony." Pamela said the person was her boy's teacher, Tommy Nevitt. Pamela testified that after the boy made the statement, he demonstrated what he meant by gnawing on the end of the table.

Pamela stated that she then went downstairs to the first-floor apartment where her mother, Doris, lives. Pamela asked her mother to come upstairs. The women went into the kitchen, and Pamela told her mother what had happened. Doris placed the boy on the counter and pulled down his pants to examine him. When Doris touched the boy's penis, the boy hollered and said, "[I]t's sore," and "[O]uch." Pamela saw a pinkish discoloration around the head of the boy's penis. Pamela had not seen the discoloration that morning when she bathed the boy.

Pamela telephoned the day care center and asked to speak to Mrs. Mays, the center's director. Mays was unavailable, and Pamela spoke to Betty Powell. Pamela then walked to the center. She spoke with Powell regarding what happened with her son. Pamela then

spoke to Mays. At Mays' request, Doris and the boy then came to the center. When the three returned home, Pamela called the child abuse hotline. Police officers Radigan and Pancer arrived at Pamela's home and discussed the alleged incident with Pamela in the presence of the boy and Doris.

Doris, the alleged victim's grandmother, testified that on August 27, 1984, her daughter Pamela came to her door, "crying, very hysterical." Doris went upstairs with Pamela and went to the kitchen, where Doris saw her grandson. He was sitting at the table, "pinching" a cupcake, being very quiet and keeping his head down. Doris stated that the boy's behavior was unusual, as normally he would hug and kiss her. After Pamela told Doris what the boy had said, Doris picked up the boy, placed him on the counter, and pulled down his pants. Doris looked at the boy's genitals. When she touched his penis, the boy said, "[O]uch, sore." Doris stated that the tip of the boy's penis was red in an area about the size of a dime. Pamela telephoned the day care center and then went to the center. Around 6 p.m., after Pamela telephoned, Doris took the boy to the center. She and the boy went to Mays' office, where they saw Mays and Pamela. Mays questioned the boy. After approximately 30 minutes, Doris, Pamela and the boy went home.

Chicago police officer William Radigan testified that on August 27, 1984, he was assigned to investigate a reported sexual abuse case which occurred at the Accounters Center. He and his partner, Officer Pancer, went to the home of the alleged victim. The officers spoke to the boy's mother, in the presence of the boy and his grandmother. The officers were not able to interview the boy, as he was very quiet and was wringing his hands. The officers took the boy and his mother to the hospital.

The next day, August 28, 1984, Radigan and Pancer went to the Accounters Center in an attempt to locate the offender. They obtained the home address and telephone number of defendant and left at the center a card containing their telephone number and address. Later that day, defendant called the officers at the police station. The officers arranged for defendant to come to the station at 10:30 p.m. When defendant failed to arrive, the officers contacted defendant and arranged to meet him at 41st and South Prairie Street and then take him to their office on East 111th Street. The officers and defendant arrived at the station around 11:30 p.m.

Radigan and Pancer took defendant to an interview room, gave defendant *Miranda* warnings, and then asked defendant questions regarding the reported abuse. Initially defendant denied the allegations.

Then defendant confessed that he committed the offense. The police asked defendant to give a written statement, which defendant did. At trial, Radigan read defendant's written statement into the record as follows:

"Dated: 8/2/84 [sic]. Accounters Community Center, 1155 West 81st. In washroom on first floor, on Monday, August 27th. I took [J.B.] to the washroom and pulled out his penis and began to suck it, perenthesis [sic], [J.B.], age 3.

I did this on [sic] my own free will."

Defendant signed the statement and Radigan and Pancer witnessed the statement. After obtaining defendant's statement, the officers telephoned the State's Attorney's office.

Assistant State's Attorney Georgia Buglass testified that about 1 a.m. on August 29, 1984, she received a telephone call from Officer Pancer of the Area 2 police station. Buglass proceeded to the station, talked with Officers Pancer and Radigan, then reviewed police reports and the written statement of Tommy Nevitt. Buglass then saw defendant, gave him *Miranda* warnings, and questioned him regarding the alleged abuse. Buglass wrote down the substance of defendant's oral statement. Buglass read the statement aloud to defendant. Defendant then signed the statement in the presence of Buglass and Pancer. As Buglass was preparing to leave the room, defendant made another oral statement. Buglass wrote down the second oral statement at the end of the first statement she recorded. She read the second statement to defendant. Defendant signed the statement, and Buglass and Pancer witnessed it. At trial Buglass read defendant's statements into the record as follows:

"My name is Tommy Nevitt. I am employed as a pre-school teacher at Accounters Community Center. And I've worked there for two years.

On Monday, August 27, 1984, I got to work at about 8:30 a.m. [J.B.] was already there when I got there. And Marcus, a program aide was watching [J.B.], and other—and the other two kids, girls, got there right after I did. And then, (Celia and Tiffany Adams) [sic] Marcus was the only other aide on duty. And I was in charge.

10:15 a.m. is snacktime. So, at ten o'clock a.m., I told [J.B.] to come to the washroom with me to wash his hands. The girls were sitting at the table when I took [J.B.] to the boy's [sic] washroom. And Marcus was watching the girls. I asked [J.B.], if he had to use the toilet, but he said, no, he just had to wash his hands. So, I lifted him up to the sink so he could wash his

hands. Then, I pulled his pants down. He laughed. While he stood on the floor, I kneeled down and put his penis in my mouth. I had his penis in my mouth for about one minute, but, I only sucked on it for 30 seconds or so. I didn't bite his penis, and I didn't hurt him. I did this to [J.B.], just because I wanted to try something new. I figured it would be safe with him.

The police have treated me fine, and no one has threatened me or promised me anything."

Defendant signed the statement and Buglass and Pancer witnessed the statement. Below the two signatures, defendant's second statement appears. Buglass read it into the record as follows:

"I have never had sex with a male before, but some of my male friends have. I figured it would be safe to try it with [J.B.]."

Defendant signed this second statement, and Buglass and Pancer witnessed it.

Chicago police officer James Pancer testified that after defendant gave the statement to Buglass, the police asked the alleged victim and his mother to come to the police station. The officers asked the mother and child to go to an interview room that had a two-way glass so that the child would be able to observe defendant. Before the boy was able to look at defendant, however, defendant looked through the glass and stated, "[T]here is the boy right there. That's the one I was with."

At trial the defense attempted to call as its first witness Betty Powell. The State objected and the trial court ruled that Powell would not be allowed to testify since the defense failed to include her name in its answer to the State's discovery request.

Defendant then called Mary Mays, who testified that she has been the executive director of the Accounters Center since 1967. She stated that defendant was on vacation from work on August 27, 1984. Mays stated that during the week of August 27, 1984, the center was being cleaned and repaired in preparation for the opening of the school in September. The center normally is open for 65 children; however, during that week, the school was open only for those parents unable to find a service for their children outside the school. There was a "skeleton crew" of employees working at that time. Mays stated that the outer door of the center is left open. In order to enter the inner door, however, a person must be "buzzed in" by someone inside.

Mays stated that she spoke to Pamela at the center on the afternoon of August 27, 1984. First she spoke to Pamela alone, and then the alleged victim was brought to the center. Mays stated that the

child did not appear to be withdrawn. Mays asked Pamela to show her the boy's penis. Pamela unzipped the boy's pants and moved the boy's penis around. Mays stated that the boy did not say "ouch" or make any other noises, but sat quietly playing with a toy Mays had handed to him.

On cross-examination, Mays testified that the name "Accounters" has a religious meaning and that Mays gave theological lectures at the center every Sunday. Mays also was questioned on cross-examination regarding the accounting procedures relating to defendant's employment at the center.

Harry Cox testified that he performed maintenance and security work for the Accounters Center. He stated that on August 27, 1984, he arrived at work at 7 a.m., his usual time. The buzzer system on the front door at the center was working on that date. Cox stated that on that day, he and Steve Rogers were painting the hallway and boys' bathroom, which is located approximately five feet from the front door of the center. Cox stated that there were three or four students, one teacher, and two teacher's assistants at the school that day.

Cox saw defendant enter the school on August 27, 1984, some time after the children went to sleep. Cox stated that the children ate at 11 a.m. and then slept from 11:30 a.m. until 2:30 p.m. Cox "buzzed" defendant into the building, and defendant remained at the center for 15 to 20 minutes "at the most." Cox saw defendant enter the time keeper's office in the center. Cox did not see defendant enter the washroom, nor did he see defendant with any of the children.

Carolyn Douglas testified that she was a teacher's aide at the Accounters Center in August 1984. Douglas did not see defendant at the center on August 27, 1984. On that date, the boys' washroom was being painted. Four children, including the alleged victim, attended the center that day. Douglas worked at the center from 9 a.m. to 5 p.m. Douglas took the two girls to the washroom during the day. Marcus Cassell, another Accounters employee, took the two boys and the two girls to the washroom. Douglas stated that other than the time when Cassell took a student out of the classroom to the washroom, the four students were with her. Douglas stated that on August 27, 1984, the alleged victim did not act in an unusual manner.

Deborah Harvey testified that she is Tommy Nevitt's girlfriend. Harvey stated that defendant picked her up from Olive Harvey College in Chicago at 1 p.m. on August 27, 1984. Defendant drove her home and was with her until 2 p.m. He left and returned again at 2:45 p.m., and they were together until 10 p.m.

The State called several rebuttal witnesses. Pamela and Doris

both testified that Mary Mays never examined the boy's penis. In addition, Loretta Brown, investigator for the Department of Children and Family Services, testified that Mays told her that defendant sometimes is alone with the children when he greets them at the center at 7 a.m.

I

Defendant initially contends on appeal that he was not proven guilty beyond a reasonable doubt and the court erred in denying his motion for a directed verdict where the State failed to prove the *corpus delicti*. Defendant asserts that the State failed to present competent evidence to corroborate defendant's confession. Defendant cites *People v. Neal* (1985), 111 Ill. 2d 180, 194, 489 N.E.2d 845, *cert. denied* (1986), 476 U.S. 1165, 90 L. Ed. 2d 733, 106 S. Ct. 2292, in which the supreme court held:

"In order for a conviction founded on a confession to be upheld, the confession must be corroborated by some evidence, exclusive of the confession, tending to show that a crime did occur and that the defendant committed it."

Defendant also cites *People v. Calhoun* (1984), 126 Ill. App. 3d 727, 467 N.E.2d 1037, which held that in order to establish both the *corpus delicti* and the essential trustworthiness necessary to corroborate a confession, there must be some independent evidence (1) tending to prove that an offense occurred; and (2) corroborating the facts contained in the confession.

Defendant asserts that the only evidence tending to link him to the alleged offense is his own statements consisting of the following: an oral statement to police; a written statement in his own handwriting; an oral statement given to and transcribed by an assistant State's Attorney; and on oral statement in which defendant allegedly identified the victim through a two-way window as the boy he had been with.

Defendant asserts that the evidence presented by the State to corroborate the confessions was the testimony of Pamela, which indicated the following: Pamela placed her son in the care of defendant at school on the morning of the incident; the boy told his mother that "Teacher Tony, bit my dingdong"; Pamela knew defendant Tommy Nevitt as Teacher Tony; and Pamela and her mother, Doris, examined the boy's penis and saw that the end of it was "pinkish" or "red."

Defendant asserts that the State's evidence was insufficient. First, the statement of the boy that "Teacher Tony, bit my dingdong" was hearsay. The trial court admitted the statement of the boy,

through the testimony of his mother, as a spontaneous declaration.

Defendant asserts that the boy's statement is ambiguous; the term "dingdong" was never defined or explained; and the boy's statement does not describe an event likely to produce an unreflecting statement. Defendant further asserts that the boy's statement fails to indicate when the alleged incident occurred. In addition, defendant contends that the statement was a product of his mother's interrogation and therefore was not spontaneous. Finally, defendant contends there is insufficient evidence to indicate that the boy was upset or shaken by some experience to produce an excited utterance. There is no evidence that the boy complained to Carolyn Douglas or Marcus Cassell, who were in charge of the children at school that day, nor did Douglas testify that the boy acted in an unusual manner.

In order for a statement to qualify under the spontaneous declaration exception to the hearsay rule, the following factors must be shown: (1) the occurrence of an event or condition sufficiently startling to produce a spontaneous and unreflecting statement; (2) the absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25.) Whether a statement qualifies under the spontaneous declaration exception to the hearsay rule is a preliminary question to be determined by the trial court. (*People v. Grover* (1983), 116 Ill. App. 3d 116, 120, 451 N.E.2d 587.) The trial court's ruling will not be disturbed on appeal absent an abuse of discretion. *People v. Bitler* (1986), 146 Ill. App. 3d 477, 481, 497 N.E.2d 137.

We do not find an abuse of discretion in the instant case. The boy's statement sufficiently met the requirements for qualifying as a spontaneous declaration. First, the boy's statement describes a sexual act upon him, an occurrence sufficiently startling to produce a spontaneous and unreflecting statement. While the prosecution failed to present specific evidence which defined the term "dingdong," a reasonable inference from the statement is that the boy used the term to describe his genitals. The mother's testimony that she became upset, went downstairs to get her mother, and the two women examined the boy's genital area indicates that the boy's statement referred to a sexual act.

Further, the evidence supports a reasonable inference that a short period of time passed from the time of the event until the boy made his complaint. The mother indicated that when she gave her son a bath on the morning of the incident, there was no discoloration of the boy's penis; after the boy's complaint, she and her mother saw that his penis was "pinkish." Further, Pamela testified that the morning

of August 27, 1984, was an uneventful one for her and her son. Her son was acting in a highly unusually way, however, when Pamela picked him up from school that day. The boy did not kiss and greet his mother in his usual way; he was unusually withdrawn and quiet; and he merely "picked at" his afternoon snack, when normally he would "gobble it down." Pamela's testimony regarding the marked change in the boy's behavior from the morning to the afternoon of August 27, 1984, indicates the occurrence complained of took place on that same day.

The evidence also indicates there was an absence of time to fabricate. The boy's failure to complain to Carolyn Douglas or Marcus Cassell at the center is understandable. The alleged incident occurred at the center, which the boy associated with Douglas and Cassell. The boy did not have an opportunity to leave that setting until his mother picked him up at the end of the school day. Little time passed from the time the boy saw his mother until he made the statement. He and his mother left the center shortly after she arrived, traveled the short distance (two blocks) home, and immediately went upstairs into their apartment. Pamela then gave the boy his snack. She left the room for a very short time and returned to find the boy still had not eaten his cupcake and remained withdrawn. It was at that time that she asked him, "What is wrong?" The boy then responded, "Teacher Tony, bit my dingdong."

Illinois courts have recognized that a child of tender years is unlikely to fabricate a story of sexual abuse. In *People v. Bitler* (1986), 146 Ill. App. 3d 477, 497 N.E.2d 137, the court, citing a Wisconsin case, stated that a very young child will not fabricate such a story for the following reasons: "(1) the child is apt to repress the incident; (2) it is often unlikely the child will discuss such a stressful incident with anyone but the mother; and (3) the characteristics of young children work to produce declarations free of conscious fabrication for a longer period after the incident than adults." (*Bitler*, 146 Ill. App. at 481-82, citing *State v. Padilla* (Wis. App. 1982), 110 Wis. 2d 414, 329 N.W.2d 263.) Further, our supreme court has held that asking a question of the declarant such as "What happened?" is insufficient to destroy the spontaneity of the statement. *People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25.

In the instant case, we find that Pamela's question, "What is wrong?" similarly was insufficient to destroy the spontaneity of her son's statement. Further, the boy repressed the statement only until he had the opportunity to talk to his mother regarding the incident. Finally, the statement meets the third requirement of a spontaneous

declaration. The statement relates to the circumstances of the event, that is, it describes the sexual act committed upon the boy. Pamela testified that the boy further described the act by "gnawing" on the end of the table.

Defendant also contends that the trial court applied an incorrect test in determining that the victim's statement qualified as a spontaneous declaration. Defendant points to the trial court's statement, "The underlying fact *** is the age of the victim involved, herein." While defendant acknowledges that the young age of the boy lessens the likelihood of fabrication, defendant contends that the trial court considered the age of the boy as the determining factor in qualifying as a spontaneous declaration. We disagree. As indicated above, we have found that the boy's statement clearly came within the requirements of a spontaneous declaration. The trial court's statement reflects the importance of the child's age in determining the spontaneity of his statement in view of the nature of the crime involved. (*People v. Bitler* (1986), 146 Ill. App. 3d 477, 497 N.E.2d 137.) We find no error.

█ In addition, defendant asserts that, assuming *arguendo* that the boy's statement qualifies as a spontaneous declaration and was an excited response to some nefarious activity, the statement should have been excluded since it did not inculpate defendant. Defendant asserts that the only link between the boy's statement and defendant was Pamela's statement that "Teacher Tony" was defendant, Tommy Nevitt. After testifying to the boy's complaint, Pamela was asked if she knew a person at that time by the name of "Teacher Tony." She answered yes, and then stated that it was her son's teacher. Then she pointed to defendant sitting in the courtroom.

We find that the prosecution failed to present specific evidence regarding whom *the child* new as "Teacher Tony." The evidence does not clearly indicate that the boy knew defendant as "Teacher Tony." The mother's testimony indicates that *she* was aware that "Teacher Tony" was defendant. Defendant asserts that the prosecutor's question erroneously asked Pamela to comment upon the statement of the alleged victim. Defendant cites, among other cases, *People v. Linkogle* (1977), 54 Ill. App. 3d 830, 833, 368 N.E.2d 1075, in which the court held that testimony as to a witness' opinion is not admissible and that a witness may not testify as to what was meant by another witness' statement.

The question by the prosecutor in the instant case was regarding whom *Pamela* knew as "Teacher Tony," rather than whom the boy knew as "Teacher Tony." Therefore, the question did not come

squarely under the facts in *Linkogle*. Nevertheless, the effect of the question and the response by Pamela likely were to imply to the jury that Pamela's son knew defendant as "Teacher Tony." In any event, in asking such a question, the prosecutor should have established a foundation regarding the basis of Pamela's knowledge that "Teacher Tony" was defendant. The prosecution's failure to establish such a foundation constitutes error.

The State contends that the identity of defendant was not at issue, apparently since defendant's confessions are in evidence. A confession may generally serve to establish the defendant's identity, one of the necessary elements to convict. In the instant case, however, the victim used the name "Teacher Tony" in referring to the offender, while defendant's name was not "Tony" but rather was "Tommy." Thus, evidence regarding whom the child knew as "Teacher Tony" would have aided the jury in determining whether defendant "Tommy" was the offender whom the child called "Teacher Tony."

■ In asserting that he was not proved guilty beyond a reasonable doubt, defendant also contends that testimony by Carolyn Douglas and Harry Cox shows that defendant was not present at the center on the morning of August 27, 1984.

It is the province of the jury to determine the credibility of witnesses and the weight to be given to their testimony. (*People v. Heidorn* (1983), 114 Ill. App. 3d 933, 449 N.E.2d 568.) A court of review will not disturb a jury verdict unless it is so unreasonable as to mandate a contrary result. (*People v. Camden* (1980), 91 Ill. App. 3d 946, 955, 414 N.E.2d 823.) In the instant case, the evidence also includes the confession of defendant and the testimony of Pamela. That evidence indicates that defendant was present at the center in the morning on August 27, 1984. The jury could reasonably have found that defendant was present at the center on that day.

Defendant also asserts that the State failed to present medical evidence to corroborate the alleged physical injury to the boy. The State did not call any hospital personnel to testify to the results of the medical examination performed on the boy on August 27, 1984, and the State would not stipulate, at the opening of trial, to the medical records offered by the defense.

We find that the absence of medical evidence was not fatal, where the boy complained to his mother and the mother and grandmother testified that the boy's genitals appeared red or pinkish. Further, the evidence indicated that the boy was taken to the hospital to be examined. Thus, there was some evidence to indicate that the boy had suffered sexual abuse. While the admission of medical records reflecting

the results of the hospital examination could have been helpful to a determination regarding the physical harm allegedly suffered by the boy, we cannot say that the absence of such medical records itself warrants a new trial. See *People v. Lambert* (1984), 104 Ill. 2d 375, 380, 472 N.E.2d 427.

## II

■ Defendant next contends that he was denied a fair trial through judicial error where the trial judge displayed favor toward the prosecution and bias against defendant. Defendant asserts that the error was so prejudicial as to constitute reversible error since the evidence in this case was closely balanced.

First, defendant contends that the trial court erroneously "personally insinuated himself" into the questioning of police officer Radigan and elicited hearsay testimony from Radigan. During direct examination, the prosecutor asked Radigan regarding his visit to the home of the victim and his mother. The prosecutor asked whether Radigan knew, at the time he went to the victim's home, the name of the offender the police were seeking. Defense counsel objected, asserting that such information was hearsay. The trial court overruled the objection and stated that Radigan could testify to the fact that he knew the name. The prosecutor resumed questioning and asked Radigan what he proceeded to do after he spoke to the victim. The court then interjected, asking whether Radigan testified to the name of the individual the police were seeking. The prosecutor responded, "No." The court then asked Radigan whom the police were looking for, and Radigan responded, "Tommy Nevitt." Defense counsel again objected and the trial court overruled the objection.

A trial judge may question a witness for the purpose of clarifying testimony. (*People v. Godbout* (1976), 42 Ill. App. 3d 1001, 356 N.E.2d 865.) The trial court has discretion to question witnesses in order to elicit the truth, although the court may not be an advocate. The correctness of each examination depends on the circumstances of the case. *People v. Hopkins* (1963), 29 Ill. 2d 260, 194 N.E.2d 213.

In the instant case the trial court's questioning of the police officer was improper. The basis of the officer's knowledge regarding the identity of defendant was not revealed, and the statement is hearsay. We find that the trial court's questioning was prejudicial to defendant. (*People v. Wells* (1982), 106 Ill. App. 3d 1077, 436 N.E.2d 688.) That the question came from the trial court heightened the error.

We already have found that the prosecution erroneously failed to establish a foundation for Pamela's identification of defendant as

"Teacher Tony." The trial court's error in questioning Officer Radigan added to the prejudice suffered by defendant at trial. In addition, as discussed below in section IV of this opinion, we find merit in defendant's assertion that the prosecution's closing argument was prejudicial. The combination of trial errors committed resulted in manifest prejudice to defendant. Therefore, we are compelled to reverse the decision of the trial court and remand this matter for a new trial. We will address in turn each remaining issue raised by defendant on appeal, although we do not find error on each ground asserted.

■■ Defendant's next assertion is that the trial court shifted the burden of proof from the State to defendant at the hearing on defendant's pretrial motion to suppress his confessions. At the opening of the hearing, the trial court stated, "You may proceed, this is your motion, Mr. Berman [defense counsel]." Defendant asserts that the trial court also "acted as prosecutor" during the hearing and "took over" defense counsel's direct examination of witnesses, asking the witnesses questions tailored to elicit responses damaging to defendant.

We disagree. The burden is on the State to prove that a defendant's confession was voluntary. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508, *cert. denied* (1982), 455 U.S. 1024, 72 L. Ed. 2d 144, 102 S. Ct. 1726.) The trial court may, however, in its discretion, request the defendant to present proof before the State presents its evidence. (*People v. Allen* (1986), 148 Ill. App. 3d 200, 498 N.E.2d 838.) In the instant case, while the court requested the defense to present evidence before the State presented evidence, the record fails to indicate that the court shifted the burden of proof from the State to defendant. We find no error or prejudice.

■■ Further, we do not find that the trial court acted improperly in asking questions of certain witnesses during the pretrial hearing. The court asked a police officer his opinion regarding the sobriety of defendant at the time of the officer's interview of defendant. Further, the court asked the assistant State's attorney who recorded one of defendant's confessions whether she identified her office for defendant before questioning him. She said she did. The trial court then asked how defendant responded to her identifying herself as an assistant State's attorney. She stated that defendant understood and still wished to talk to her.

A trial judge may question witnesses in order to elicit the truth or to clarify ambiguities in the witnesses' testimony. (*People v. Costello* (1981), 95 Ill. App. 3d 680, 420 N.E.2d 592.) The propriety of the court's questioning depends on the circumstances of each case and rests largely within the discretion of the trial court. (*People v. Palmer*

(1963), 27 Ill. 2d 311, 314, 189 N.E.2d 265; *Costello*, 95 Ill. App. 3d at 686-87.) This is especially true where the cause is tried without a jury and the danger of prejudice is lessened. (*Palmer*, 27 Ill. 2d at 315.) We have reviewed the portions of the record cited by defendant, including those questions described above, and find that the court was acting within its discretion in questioning certain witnesses at the hearing. We do not believe that the court's questions were improper nor did they show a bias against defendant.

■ Defendant also asserts that the trial court conveyed to the jury a negative impression of defense witness Mary Mays, the director of Accounters Community Center. On two occasions during Mays' testimony at trial, the court ordered that the jury be removed from the courtroom so that it could speak to Mays regarding her 'evasive-[ness]," her failure to answer questions during cross-examination with a "yes" or "no" answer, and her answering of questions with questions. Defendant asserts that the court showed impatience toward the witness, thereby reducing her composure and affecting how the jury viewed her credibility.

We find no error here, as the trial court properly responded to the continued uncooperative behavior of the witness by calling a recess in order to clarify for the witness her function at trial and to admonish the witness regarding her improper responses and questions. The record does not indicate that the court's admonishments toward the witness were overly critical or were harsh. Further, we believe that any possible prejudice to defendant which may have resulted from the trial court's admonishments to the witness was very minimal.

Defendant next asserts that the trial court erred in allowing the State to cross-examine Mary Mays extensively and in a derogatory fashion regarding irrelevant and collateral matters, including her religious beliefs, her hiring of an employee other than defendant to work at the center, and tuition subsidies and State audits. We agree with the State that the prosecution's cross-examination of Mays regarding those matters was proper insofar as they showed Mays' interest and bias and impeached her credibility as a competent administrator. (*People v. Gonzalez* (1984), 104 Ill. 2d 332, 337-38, 472 N.E.2d 417.) The questions regarding Mays' religion related to Mays' interest in the Accounters Center as a weekly gathering place for her theological lectures. Mays stated that the name "Accounters" had a religious significance. The State also noted that questions regarding the accounting and record-keeping system were relevant in that Mays testified that defendant was on vacation on the day of the alleged incident. An analysis of the employee sign-in procedure was relevant to impeach

Mays' testimony regarding an alibi of defendant. Finally, the questions regarding the method of hiring another employee was relevant to contrast the method utilized for hiring defendant and to impeach the competency of Mays as an administrator and as a witness who was vouching for defendant.

The latitude to be allowed in cross-examination of witnesses rests largely within the discretion of the trial court. (*People v. Gallo* (1973), 54 Ill. 2d 343, 297 N.E.2d 569.) In the instant case we find no abuse of discretion. We do not find that the questions on cross-examination of Mays went beyond the scope of Mays' direct examination. Further, we note that Mays' uncooperative behavior, and the necessity of the trial court to admonish the witness on two occasions during cross-examination, contributed to the lengthiness of her testimony.

■ Defendant also contends that the trial court erred in refusing to allow the defense to elicit from State witness Pamela, the alleged victim's mother, testimony that when she took the boy to the hospital on the evening of the alleged incident, hospital personnel found nothing to indicate the boy had been sexually abused. The State responds that the defense's cross-examination question regarding the results of the hospital examination was improper as it went beyond the scope of direct examination. The State did not ask Pamela on direct examination regarding taking her son to the hospital. We note that there was no objection when, during cross-examination, Pamela was asked whether she took her son to the hospital that day and she responded affirmatively.

We believe that the State's objection to defense counsel's question regarding the results of the medical examination was properly sustained in that it was attempting to elicit hearsay. Thus, the trial court properly acted within its discretion. (*People v. Bristow* (1980), 80 Ill. App. 3d 535, 400 N.E.2d 511.) The medical records were not admitted at trial, nor was there any testimony of hospital personnel regarding the type of examination that was conducted or the results of the exam. The mother's response to defense counsel's question would be unverifiable hearsay regarding the alleged lack of permanent or other physical injury to the boy.

■ Further, defendant contends that the trial court erred in refusing to allow potential defense witness Betty Powell to testify. Defendant asserts that the trial court erroneously relied on the standard that counsel must attest to the credibility of his witness before the witness may testify. Defendant asserts that that standard was laid to rest with the adoption of Supreme Court Rule 238.

Supreme Court Rule 238 (107 Ill. 2d R. 238) deals with hostile

witnesses and the impeachment of one's own witnesses and does not apply to the issue raised. As noted by the State, defense counsel failed to include the name of Betty Powell in its answer to written discovery prior to trial. The first time that defense counsel notified the court or opposing counsel that he intended to call Powell was on the third day of trial. When questioned by the trial court, defense counsel said that he had just met Powell that third day of trial. Defense counsel stated that Powell would testify that she was at the center on the morning of the alleged incident. The State contended that it was not made aware of what the content of Powell's testimony would be and it had no opportunity to interview the witness or prepare for a cross-examination of her.

We find that defendant's failure to include Powell's name as a potential alibi witness in its answers to pretrial discovery violated a direct order of the trial court, entered pursuant to Supreme Court Rule 413(d) (107 Ill. 2d R. 413(d)). Supreme Court Rule 413 (d)(i) requires that a defendant disclose prior to trial a list of witnesses he intends to call at trial. (107 Ill. 2d R. 413(d)(i).) Failure to comply with this disclosure requirement subjects a defendant to possible sanctions, including exclusion of the undisclosed witness. (*People v. Partee* (1987), 157 Ill. App. 3d 231, 252, 511 N.E.2d 1165, *cert. denied* (1988), 484 U.S. 1072, 98 L. Ed. 2d 1006, 108 S. Ct. 1043.) Whether or not to impose such a sanction is within the discretion of the trial court. (*People v. McKinney* (1983), 117 Ill. App. 3d 591, 596, 453 N.E.2d 926.) We find that under these circumstances, the trial court properly acted within its discretion in precluding defense counsel from calling Powell.

## III

■■ Defendant also contends that he received ineffective assistance of counsel where his trial counsel failed to object to inadmissible evidence linking defendant to the charge and failed to introduce medical evidence showing that the victim had not been sexually abused. Defendant asserts that the alleged trial errors meet the two-pronged test of *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, adopted by the Illinois Supreme Court in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061. *Strickland* provides that ineffective assistance of counsel is shown where: (1) the attorney's representation fell below an objective standard of reasonableness and the shortcomings of counsel were so severe as to deprive defendant of a fair trial; and (2) there is a reasonable probability that, but for the attorney's unprofessional errors, the results of the pro-

ceedings would have been different. *Strickland,* 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

■■■ Specifically, defendant asserts that defense counsel failed to object to Pamela's testimony regarding her belief that "Teacher Tony" meant defendant, and that defense counsel failed to argue during closing argument that the evidence did not show what the boy meant by "Teacher Tony" or "dingdong." The record indicates that defense counsel objected to Pamela's testimony as to the child's statement, "Teacher Tony, bit my dingdong," on the grounds that it was hearsay. Defense counsel, however, apparently failed to object on the ground of a lack of basis to the mother's identification of defendant as "Teacher Tony" or regarding the boy's definition of "dingdong."

As stated earlier, we believe that the evidence supports a reasonable inference that the boy was referring to his genitals when he used the term "dingdong." Regarding the use of the term "Teacher Tony," defense counsel did object to the question by the prosecution, but on a different ground than defendant suggests on appeal. We do not believe that defense counsel's conduct was so unreasonable as to fall within the scope of *Strickland.*

Further, defendant asserts that defense counsel failed to argue during closing argument that the evidence failed to show what the boy meant by "dingdong" and "Teacher Tony." We do not believe that but for counsel's failure to object or to argue this point during closing argument that the results of defendant's trial would be different. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

Defendant also asserts that defense counsel failed to object when the court questioned Officer Radigan in the presence of the jury regarding Radigan's statement that defendant had been identified as the offender. We find no merit in defendant's assertion. The record indicates that defense counsel did object to the court's question.

Defendant also asserts that defense counsel failed to object to the State's closing argument that the school authorities must have told police that "Teacher Tony" was defendant. During closing argument, the prosecutor stated that "common sense" would lead the jury to the conclusion that the employees at the Center identified defendant as the offender. On appeal defendant contends that the evidence indicates that at the Accounters Center the police asked only for the address and telephone number of Tommy Nevitt, and that it is the only information given to them at the time.

We agree with defendant that the evidence failed to indicate that the employees of the Accounters Center identified defendant as

"Teacher Tony." We do not believe, however, that but for defense counsel's failure to object to the prosecutor's statement in closing argument that the results of the trial would have been different.

Defendant also contends that defense counsel failed to introduce medical testimony that the alleged victim was examined at the hospital and no sign of trauma to his genitals was found. Defense counsel failed to attempt to obtain medical testimony until after the trial began. Further, defendant asserts, the State would not stipulate at that time to the medical records. Defendant also contends that his trial counsel failed to argue at the close of trial that the boy was examined at the hospital and the State failed to present evidence of the results of the examination. Further, defendant asserts that since defense counsel subpoenaed the hospital records and record keeper to trial indicates that counsel was aware of the helpfulness of the records to defendant. However, defendant argues, his counsel apparently was unaware of the statute which precludes the admission of such medical records into evidence (Ill. Rev. Stat. 1985, ch. 38, par. 115—5(c)(1)).

As stated earlier, we do not find that the absence of medical records was fatal to defendant's case. Therefore, we cannot say that the results of the proceeding would have been different but for defense counsel's failure to make those arguments.

Further, defendant contends that defense counsel apparently was unaware, during the pretrial hearing on defendant's motion to suppress his confession, that the burdens of going forward with evidence and proving the voluntariness of a confession were on the State. As we have found that the burden of proving the voluntariness of the confession never shifted from the State in this matter, and that the trial court acted within its discretion in requesting the defense to present evidence before the State presented evidence, we find no merit in defendant's argument.

Defendant also contends that his trial counsel failed to ask the court to instruct the jury that defendant could not be found guilty on the basis of his confessions alone, but that the State must prove by independent evidence that the crime occurred and that defendant committed it.

Defense counsel's tendering such an instruction for the jury's use would have resulted in a useful clarification of the law regarding this issue. As the function of jury instructions is to convey to the jury the principles of law applicable to the charge and the evidence (*People v. Peebles* (1984), 125 Ill. App. 3d 213, 465 N.E.2d 539), such an instruction should, in all reasonableness, have been given to the jury. We do not find, however, in view of the other evidence the State presented

which corroborated the confession, that the second part of the *Strickland* test, namely, that but for counsel's conduct or omission the results of trial would have been different, is met.

Defendant also contends that his trial counsel failed to elicit from Pamela what time she arrived at school with her son. Defendant asserts that the evidence is contradictory, in that Pamela testified that defendant already was at school when she and her son arrived, while defendant's confession to the assistant State's Attorney indicates that the boy was already at school when defendant arrived.

We do not find that defense counsel's failure to point out this inconsistency between the testimony of a State's witness and defendant's confession itself resulted in an unfair trial for defendant. The effect of such conduct by defense counsel would have been to highlight for the jury the inconsistency and urge the jury to consider it carefully in determining the weight to be given to each statement and the credibility of each person. The jury was instructed that it was to judge the credibility of witnesses and to determine the credibility and weight of defendant's confession. In view of such instructions, we cannot say that the results of defendant's trial would have been different but for defense counsel's failure to attempt to impeach Pamela's testimony.

Defendant also asserts that counsel failed to call Marcus Cassell, one of the employees of the center who was in charge of the children on August 27, 1984. Defense counsel had obtained an affidavit from Cassell and listed him as a potential alibi witness in its answer to discovery.

As the State points out, the decision whether or not to call a witness generally is a question of trial strategy and therefore is not reviewable on appeal. (*People v. Wright* (1986), 111 Ill. 2d 18, 488 N.E.2d 973.) We find no grounds here to look to an exception to that rule. Cassell's affidavit indicates that Cassell was with the victim from 10 a.m. to 2 p.m. on August 27, 1984, and that defendant was not present during that time. Cassell said the only time that the boy was out of his sight was when Cassell accompanied him to the washroom, when Cassell waited outside for him and returned him to his cot. While Cassell might have been a helpful alibi witness, we cannot say that defense counsel's failure to call him to testify changed the result of defendant's trial.

Cassell's affidavit may contradict the testimony of Carolyn Douglas, who also was in charge of the children at the center that day. Douglas testified that she took both boys and girls to the washroom and may have taken the victim to the washroom on that day. In view

of the circumstances, we do not find that counsel's failure to call Cassell was so unreasonable as to deprive defendant of a fair trial, nor that the failure changed the result of the trial. *People v. Wright* (1986), 111 Ill. 2d 18, 488 N.E.2d 973.

Further, defendant contends that defense counsel failed to provide the State the name of defense witness Betty Powell until the third day of trial. The record indicates that defense counsel never saw Powell at the center when he was investigating the case, but met her for the first time in the hallway after the trial began. Whether defense counsel's failure to meet and interview Powell prior to that time was the result of an unreasonable failure by defense counsel to obtain the identity of potential witnesses or not is unclear from the record.

Defense counsel indicated at trial that Powell would testify that she was at the center during the morning of August 27, 1984, what time she arrived at the center, and what she was doing there. Defense counsel failed to indicate, however, that Powell's testimony would exonerate defendant. The failure of counsel to obtain the identity of and to interview Powell prior to trial, therefore, was not so unreasonable as to deny defendant a fair trial, nor would the results of trial have been different but for counsel's failure to call Powell to testify. *People v. Wright* (1986), 111 Ill. 2d 18, 488 N.E.2d 973.

Finally, defendant asserts that counsel failed to attempt to amend the defense's answer to discovery with the name of Renee Dishman until after the jury was sworn. The court granted the State's motion to exclude Dishman as a witness. Defense counsel failed to make an offer of proof regarding the substance of Dishman's testimony.

Defendant has failed to indicate in what way the results of the trial would have been different but for counsel's failure to amend the discovery answer to include the name of Dishman and what effect Dishman's testimony would have on the trial. Absent such an indication, we do not find merit in defendant's argument. *People v. Wright* (1986), 111 Ill. 2d 18, 488 N.E.2d 973.

### IV

■ Defendant also contends that he was denied a fair trial where the State's closing argument was improper and prejudicial. Defendant cites *People v. Guyon* (1983), 117 Ill. App. 3d 522,. 453 N.E.2d 849, in which the court held that a prosecutor's comments in closing argument may constitute reversible error where the comments relate to matters not properly in evidence and pertinent to the issues in the case.

Specifically, defendant asserts that the prosecutor "manufac-

tur[ed] evidence" when he stated that the victim's mother took the boy to school and handed him over to his teacher, who was Teacher Tony, also known as Tommy Nevitt. Further, the prosecutor asserted, without support in the record, that the employees of Accounters Community Center apparently gave the name of defendant to police when the police arrived at the center to investigate the reported incident.

Improper remarks in argument of counsel do not constitute reversible error unless they result in substantial prejudice to defendant. (*People v. Pittman* (1982), 93 Ill. 2d 169, 442 N.E.2d 836.) We find that the comments referenced above, in addition to other trial errors committed, resulted in substantial prejudice to defendant and therefore constitute reversible error. The prosecutor's comment, "Teacher Tony, also known as Tommy Nevitt," was based on the testimony of Pamela that she knew "Teacher Tony" to be defendant, Tommy Nevitt. As we have held, however, the prosecution failed to establish the basis of Pamela's knowledge of "Teacher Tony" as defendant or to show that the victim knew defendant as "Teacher Tony." The prosecutor's comment during closing argument, therefore, was not well supported by the evidence. (*People v. Holman* (1984), 103 Ill. 2d 133, 469 N.E.2d 119, *cert. denied* (1985), 469 U.S. 1220, 84 L. Ed. 2d 347, 105 S. Ct. 1204.) Further, there is no specific evidence in the record supporting the prosecutor's comment that the employees of the center probably gave police information that defendant was known as "Teacher Tony."

Defendant also asserts that the State improperly referred to defendant's failure to provide an alibi stating where he was on the morning of August 27, 1984. At trial, defense counsel objected, asserting that defendant had no burden of proof. The trial court overruled the objection, stating that there was no question that defendant need not prove his innocence and that the prosecutor's comment was a reasonable inference from the evidence.

We find that the prosecutor's comment constituted error. (*People v. Eddington* (1984), 129 Ill. App. 3d 745, 776-77, 473 N.E.2d 103, 125.) The comment was fairly lengthy, approximately 1⅓ pages long in the transcript. We agree with the trial judge that the prosecutor's comment did not indicate that the burden was on defendant to prove his innocence. However, the prosecutor stated that it seemed "strange" that defendant would not call any witnesses to testify regarding where he was that morning. We do not believe that the trial court's instructions or comments to the jury regarding the burden of proof in the case served to cure the error resulting from the improper comment regarding defendant's failure to present alibi witnesses. See

*Eddington,* 129 Ill. App. 3d at 777.

Further, defendant asserts that the prosecutor erroneously told the jury that no one from the school told police that defendant was on vacation. The testimony of Mary Mays was unclear in that she stated that she told police that defendant was on vacation during the week that the alleged incident occurred. Then she stated that she "might have used the term vacation," and merely stated that defendant did not work that week.

However, since Mays' testimony seemed to indicate that she did tell police that defendant was on vacation that week, the prosecutor's comment that no one told the police that defendant was on vacation was improper. This comment contributed to the reversible error committed at trial.

Finally, defendant asserts that the prosecutor improperly alluded to Mays' religious beliefs and stated that Mays "is going to be accountable \*\*\* for what condition that place [the center] is in." The comment regarding Mays' being accountable clearly was improper, as May's accountability regarding the center was not at issue in the instant case. This comment also contributed to the reversible error committed in this case.

## V

Finally, defendant asserts that the sentence of 18 years, while within the statutory range of 6 to 30 years (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(3)), is excessive in view of his lack of a criminal record, his young age, and his potential for rehabilitation.

We need not address defendant's issue regarding sentencing, however, since we are reversing the judgment of the circuit court and ordering a new trial.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the matter remanded for a new trial.

Judgment reversed and cause remanded for a new trial.

WHITE, P.J., and RIZZI, J., concur.