(No. 20373.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES MADISON STILSON, Plaintiff in Error.

*Opinion filed December 18, 1930.*

FRANK T. SHEEAN, and LOUIS A. NACK, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, HARRY C. TEAR, State's Attorney, and CARL I. DIETZ, for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Dr. James Madison Stilson was indicted by the grand jury at the May term, 1930, of the circuit court of Jo-Daviess county. He pleaded not guilty, was tried by a jury at the June term, 1930, found guilty of murder and sentenced to the penitentiary for twenty years. He has sued out this writ of error for a review of the judgment.

The first two counts of the indictment charged Dr. Stilson, the defendant, with assault upon the body of Anna Lou Garner and unlawfully, feloniously and willfully thrusting and inserting a certain glass tube into her private parts and womb, she being then pregnant with child, and thereby unlawfully, feloniously and willfully attempting to procure and produce an abortion of Miss Garner which was not then and there necessary for the preservation of her life, and that the attempt to procure and produce the abortion caused her death on March 22, 1930. The second count was practically the same as the first. The third count charged defendant with assaulting Miss Garner and employing certain instruments, the description of which is unknown to the grand jurors, and thrusting and inserting said instruments into her private parts and thereby feloniously and unlawfully attempting to procure an abortion, she being then pregnant with child and the abortion being unnecessary for the preservation of her life, by reason of which defendant inflicted upon Miss Garner a mortal wound, of which she

died March 22, 1930. The fourth count charges defendant with the use of a certain glass tube and other unknown instruments and devices for procuring an abortion upon Miss Garner. The fifth count charges the defendant with murder by making an assault in some way and manner and by some means and device upon Miss Garner, and by attempting to procure an aborption by forcing and thrusting unknown devices into her body and womb and thereby producing a mortal wound, from which she died March 22, 1930. The sixth count charges an assault by defendant with certain unknown instruments and devices and by some manner and means upon Miss Garner, and the willful and felonious striking and bruising, giving to Miss Garner a mortal wound, of which she died.

Some complaint is made that the trial was held very soon after the indictment was returned, but the record discloses no injury to the defendant by the early trial, and no motion was made for a continuance or postponement of the trial.

Defendant had been a practicing physician for thirty-five years and had practiced in four States and in thirteen different communities in the four States. He had been practicing in the village of Warren, in Jo Daviess county, for about four months prior to March 18, 1930. Charles Raab, a farm employee twenty-four years of age, who lived in Stockton, Illinois, and who evidently was responsible for Miss Garner's condition, took her to defendant's office in the village of Warren, arriving there about nine o'clock in the evening, March 18, 1930. Raab remained outside and Miss Garner went into defendant's office. Defendant testified she said she feared she was pregnant and asked him to do something for her; that she said she had previously taken certain tablets obtained from another doctor but they had produced no results. He testified he examined Miss Garner but could find no evidence of pregnancy; that she had gonorrhea, and he told her she would probably mis-

carry anyway. He further stated she was in his office from twenty to forty minutes and offered him a fee of $50 if he would aid her. Arthur Humason, a man residing in Freeport, testified on behalf of defendant that he was a patient of Dr. Stilson and was sitting in the waiting room of the doctor's office when Miss Garner came out of his private office and that she was in tears; that he heard her ask the doctor if he could not do something for her; that he said he could not, and Miss Garner said she would give him $50 if he would, but he refused to take her money and told her that due to her condition he did not think she would carry the child until fall. In the early evening of the next day after Miss Garner's visit to defendant's office in Warren, Raab telephoned defendant, asking him if he would come to Miss Garner's home in Stockton to see her as she was in bad shape. He told Raab he would be there in a half hour. He drove to Stockton, where Raab met him and showed him Miss Garner's residence. Defendant's further testimony was, in substance, that he was let into the dining room of the Garner home, and very shortly Mrs. Green, who was a sister of Miss Garner, came into the room. Mrs. Green took him into the bed-room. He found the temperature of the patient about 100 and that she had a slight cough and cold but had sent for him on account of pains in her abdomen. She was suffering great pain over both ovaries and the peritoneum. She was in bed with a night dress on and was wearing a menstrual pad. After examining her he made a solution of lysol and put his instruments in it, crossed her on the bed and put each foot on a chair and used a speculum to open the vagina. He found a slow discharge of mucous. He used cotton on a pair of forceps and swabbed up the blood, then inserted a curette and removed about three blood clots. He stated the curettement consisted of placing a curette in the uterus and scraping out what was in it. He placed no packing in the uterus at any time and did not remove any from the patient.

He said he found no evidence of a fœtus. He called the next day about noon to see the patient. She was not suffering as much as she had been the night before. They had no way of giving a douche, so he went down-town and got a glass douchepoint and some lysol for a vaginal douche. He said the patient got out of bed and on a slop jar and he gave her a douchepoint and she inserted it herself. She then got back into bed and the doctor went home. Shortly after reaching home some of the parties called him over the telephone and said they were taking the patient to the hospital. He heard no more of the girl or her case until he was arrested.

Mrs. Green, the sister of Miss Garner, testified she saw defendant use his instruments and remove from the patient's private parts the packing in her body, the blood clots and everything. She testified she said while he was doing that if she had to suffer like her sister was she would rather have children, and that he replied, "Why have children when you can get out of it this easy?" She testified the doctor told her on the occasion of his second visit to Stockton to see her sister that the patient's trouble was her lungs; that she was probably going to have pneumonia. She said to him that she thought the best place for her sister was the hospital, but he said her home would be better for her and to have a trained nurse. She was taken that day to St. Francis Hospital. Mrs. Green testified she went to Miss Garner's home on the occasion of defendant's visit the second day, but he was about ready to leave and she did not know what he did that day.

Mary Garner, the mother of Anna Lou Garner, testified she lived in Stockton; that her daughter became ill on March 19, 1930, and that evening Charlie Raab called Dr. Stilson; that when the doctor came, she, Charlie and Mrs. Green were present; that when the doctor came in he asked if Anna was suffering much and said he thought he would find a clot of blood and she would be easier after he re-

moved the packing. He was there fifteen or twenty minutes, and the mother testified she saw him put his instruments into Anna's body, remove clots of blood and take out the packing of cotton from the womb. She also heard him tell Mrs. Green on the occasion of his second visit to see her daughter, which was about noon the next day, that she had pneumonia or infection of some kind.

There is no proof of how any packing came in the body of Miss Garner. Her sister and her mother testified that they saw defendant remove the packing from her body and also some clots of blood. Defendant denied removing any packing but admitted he curetted the patient and removed blood clots. When Miss Garner was taken to the hospital in Freeport Dr. Harlan treated her. Dr. Harlan testified that when the patient was brought to the hospital she had a temperature of 103.6 and a great deal of abdominal pain and a very feeble circulation. He found peritonitis generally and a large uterus, which was soft and boggy and apparently contained something within it. The doctor testified his diagnosis disclosed sepsis, or blood poisoning, but no other organic trouble; that it originated from the uterus. On the doctor's further examination and treatment of the patient on the morning of March 21, 1930, he gave her a gas anesthesia and emptied the uterus. He found the decayed product of conception of about one month's development that had remained in the uterus. She was much worse March 22 and died about one o'clock that afternoon. The cause of her death was sepsis, which had its origin in the uterus. An autopsy was performed on the body by Dr. Phillips, assisted by Dr. Harlan. The autopsy disclosed the uterus was inflamed, soft, and the size of one month's pregnancy. The cervix of the uterus was inflamed and there was a puncture on the left side, near the mouth of the uterus, that did not extend through the entire wall of the uterus. There was pus in the pelvic cavity back of the uterus and the tubes were acutely inflamed. The punc-

ture was round and about the diameter of a ten-penny nail. The other organs of Miss Garner were normal except that the spleen was a little large. Dr. Harlan was permitted to answer, over objections, that his opinion was that the sepsis was caused by the puncture of the uterus. He also testified he found no diseased condition of any organs outside of the pelvic region; that no organs were abnormal and the bony structure of the pelvic region was normal. Dr. Phillips assisted in the autopsy and testified that the lungs of the deceased showed no signs of the patient having had pneumonia and were practically normal.

We believe we have stated the substance of the material and important testimony on both sides, from which it appears conclusively that Miss Garner's death was produced by efforts to bring about an abortion and that the abortion was not necessary to preserve her life. The proof of the guilt of defendant depends upon the circumstances and facts of his connection with the treatment of Miss Garner. He denied that he did anything to produce an abortion or that he knew the girl was pregnant. In this he was contradicted by the girl's sister and mother above referred to. There can be little doubt that Miss Garner was anxious to have an abortion produced. She went to defendant for that purpose at his office, where he examined her and testified he found no indications of pregnancy but did find indications of gonorrhea. He testified he refused her request to perform an abortion, and a witness who was in the reception room as Miss Garner went out testified defendant told her he could not do what she wanted him to do for $50. Defendant insists that the evidence is insufficient to sustain the verdict. It was contradictory in material parts, but it was for the jury to determine who was entitled to more credit, and by their verdict they gave credit to the witnesses who contradicted defendant. We cannot say they erred in doing so. Defendant had three oppor-

tunities to commit the offense charged. It was the province of the jury to judge from the evidence and the witnesses on the stand what weight should be given to their testimony, and a court is not justified in usurping the functions of a jury by substituting its judgment for theirs in passing on the weight and credibility of conflicting testimony. *People* v. *Hohimer,* 271 Ill. 515; *People* v. *McCann,* 247 id. 130; *People* v. *Schoop,* 288 id. 44.

Defendant asserts it was error to give People's instruction No. 2, which is, in substance, like the wording of section 140 of the Criminal Code, and cites *People* v. *Schultz-Knighten,* 277 Ill. 238, in support of the assignment of error. In that case the court held that as malice was not an element of the crime of abortion, for which defendant was indicted, the giving of the statutory definition of murder and repeatedly instructing the jury in regard to malice was confusing the crime for which defendant was on trial with the elements of another crime, and was erroneous. The first five counts of the indictment in this case charge defendant with an attempt to produce an abortion upon Miss Garner by means of thrusting an instrument or device into her private parts or womb, by reason of which attempted abortion she died. The sixth count charges defendant struck, penetrated and bruised Miss Garner with unknown instruments and inflicted upon her a mortal wound, of which she died. We are at loss to see how defendant could have been prejudiced by the giving of the second instruction. *Clark* v. *People,* 224 Ill. 554.

By People's instruction No. 9 the jury were told that it was not necessary for the prosecution to prove, beyond a reasonable doubt, every material allegation in every count in the indictment to justify finding defendant guilty; that if they believe, beyond a reasonable doubt, every material allegation in some one count of the indictment was proven then they were justified in finding defendant guilty on that count. The objection made to the instruction is, it was left

to the jury to say what are material allegations in the indictment. Standing alone this instruction would have been erroneous, but instructions Nos. 6 and 7 set forth the essential material facts constituting the crime with which defendant was charged. Where instructions taken as a series fully and correctly state the law, one instruction is not required to state all the law of any case provided other instructions do state the law. *People* v. *Scimeni,* 316 Ill. 591.

It is true the indictment charged two offenses, but the record shows defendant made no motion to quash the indictment or to require the State to elect upon which counts a conviction would be sought and without objection proceeded to trial. It was said in *People* v. *Jones,* 291 Ill. 52: "Even though an indictment be double, advantage of that defect cannot be taken by motion in arrest of judgment. Nor is the court required to compel the State to elect the count or counts upon which conviction is to be sought, in the absence of a motion to that effect on the part of the defendant. Where, as in this case, the defendant is content to plead to the indictment as it stands, without a motion to quash or to compel election, he cannot take advantage of a misjoinder of counts on a motion in arrest of judgment.—*People* v. *Kingcannon,* 276 Ill. 251."

At the close of the People's evidence, and again at the close of all the evidence, defendant's counsel presented to the court a motion to the effect that the evidence was not sufficient to sustain a conviction and that if a verdict was returned it would be set aside, and requested the court to so advise the State's attorney. No advantage could come to defendant from assigning error on the refusal of the court to grant such a motion and none is assigned.

No error was committed by the court in permitting the doctors who treated the deceased and who performed the autopsy upon the body to answer as to their opinions about the condition of the patient and the cause of her death.

We do not regard the court as committing any error that was prejudicial to defendant. The jury have found him guilty and the court has approved the verdict. We do not think there is any justification for us disturbing it, and the judgment will therefore be affirmed.

*Judgment affirmed.*