THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JAMES LARRY TERRY, Defendant-Appellant.

Fourth District   No. 4—87—0912

Opinion filed December 28, 1988.—Rehearing denied January 19, 1989.

Daniel D. Yuhas and Gary R. Peterson, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

On October 15, 1987, following a jury trial in the circuit court of Champaign County, defendant James Larry Terry was found guilty of the offenses of aggravated criminal sexual assault and unlawful use of weapons by a felon in violation of sections 12—14(a)(1) and 24—1.1, respectively, of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1987, ch. 38, pars. 12—14(a)(1), 24—1.1). On December 22, 1987, defendant was sentenced to a term of natural life imprisonment for the assault offense, and 10 years for the weapons offense. Defendant appeals. We affirm.

On October 14, 1987, the morning of trial, defendant appeared before the court and asked for a continuance to obtain his own counsel. He indicated he believed the public defender was competent, but that due to the case load, defendant believed counsel could not give 100% to his case. Defendant further stated that while he personally could not afford to retain counsel, his parents told him the day before that they could help him in this matter.

The court observed that defendant was arraigned on June 23, when counsel was appointed for him, and during that interim, he had never complained about counsel. The court also noted the jury had been called, and the State had all of its witnesses, including one from Washington, D.C., present to testify. Accordingly, the court denied the request, and the case proceeded to jury selection. Defendant then decided he did not wish to be present for the trial, asserting that the court and the system were biased against him. The court, noting that the question of the identification of the assailant was critical to the case, denied this request. Defendant repeated this request on the second day of trial, which was again denied.

The State's evidence established that on June 17, 1987, at approximately 10:30 p.m., D.G., a University of Illinois coed, was walking from the campus to her apartment. As she was unlocking her apartment door, a black man approached her from behind armed with a knife. He forced his way into her apartment and forced her to engage in sexual intercourse with him. D.G. called the police.

The next day, she went to the police station to develop a composite sketch of her assailant. She was shown a group of photographs, which included an older picture of defendant, but could not pick anyone out.

On June 20, 1987, at approximately 7 p.m., H.K., a University coed, was walking back to her apartment. As she approached her door, a black man approached her from behind with a knife. She screamed.

Steve Taylor was visiting H.K.'s neighbor at that time. He is employed as a special investigator with the Illinois Central Gulf Railroad Police. He heard the scream and, looking out the door, observed the man with the knife. He opened the door, kicked the knife out of the assailant's hand, and then chased the assailant. He was unable to apprehend the attacker, but did recover the knife. H.K. and Taylor were separately shown the composite D.G. created. They both believed the assailant looked very similar to the composite.

Just prior to this assault, Diane Ersepke, another of H.K.'s neighbors, was driving home. She observed a black man who appeared to be following H.K. Once Ersepke got to her apartment, she was able to observe this man from her apartment window. She watched him enter the courtyard to H.K.'s apartment, and then she heard a scream. She immediately called the police. She also looked at the composite and believed it looked like the man she saw.

On June 22, Ersepke was walking on the campus when the man she had observed walked by her. She called the police. The police picked defendant up about six blocks from where Ersepke saw him. Ersepke viewed him through a one-way window at the police station and identified defendant as the man who followed H.K.

Defendant was interviewed and gave his girlfriend and her family as alibi witnesses for June 20. However, he could not remember what he had done on June 19. Defendant explained he was on campus looking for work, but he could not remember with what establishments he had checked. When informed that a knife had been recovered and there was a possibility that fingerprints would be found on it, defendant stated either they would not find his prints on the knife, or they would get no prints off the knife.

On June 23, defendant participated in a lineup. At the time the lineup was arranged, defendant's hair hung down between his shoulders and chin. This matched the description given by the witnesses. Fifteen minutes later, when it came time for the viewing, defendant's hair was in braids. D.G. picked defendant out of the lineup, stating she was 98% to 99% sure he was the assailant. Her hesitancy was due to the fact defendant's hair was in braids, and the assailant's hair was long. Taylor was 100% certain defendant was the man who assaulted H.K.

On June 30, the police took hair, blood, and saliva samples from

defendant. They could not get a pubic hair sample because defendant had shaved that area of his body. He told the police he does this every summer.

At trial, D.G. positively identified defendant as the assailant. She also identified a knife as being similar to the one her attacker used. Taylor and Ersepke also positively identified defendant as H.K.'s attacker. Taylor identified the knife as being the one recovered on June 20. H.K. tentatively identified defendant as her assailant. She noted defendant's hair was shorter than her attacker's, but the similarity in the facial shape and type was quite striking.

A serologist with the FBI tested the samples. His analysis revealed that defendant and D.G. were both type O blood. However, D.G. was a nonsecretor, so any test would not be affected by her blood. There was semen on the vaginal and rectal swab of D.G. Tests revealed it was type O blood. Since D.G. is a nonsecretor, a type O secretor, like defendant, had to be the source. Approximately 40% of the black population are secretors.

The parties stipulated that defendant had a prior felony conviction and there were no fingerprints found suitable for comparison on the knife or the doorknob of D.G.'s apartment. This concluded the State's case.

Defendant testified that on June 17 he was with his girlfriend, Brenda Jones, from 4:30 p.m. until the next morning. On June 20, he picked up Brenda at her apartment around 6 p.m. and went to a party at her sister's until early the next morning. He also denied putting his hair in braids prior to the lineup.

Defendant presented various alibi witnesses. Brenda Jones did not corroborate defendant's testimony for June 17, saying that she first saw him that day around midnight. She did back up his testimony concerning June 20. Connie Jones, Brenda's sister, testified that on June 17 she saw defendant around 7:30 p.m. On June 20, she and her boyfriend attended a party at 8 p.m., and defendant was already there. Terry Lewis, Connie's boyfriend, testified similarly concerning June 20. Johne Mae Jones, Brenda's mother, testified that on June 17, defendant came by looking for Brenda around 9:30 p.m., and then, when she was not there, left immediately. The jury found defendant guilty as charged.

A sentencing hearing was conducted on October 27, 1987. The victim of an aggravated criminal sexual assault which occurred on April 25, 1987, testified identifying defendant as the perpetrator. The State also presented evidence establishing defendant was convicted for rape in 1971, receiving a prison sentence of 4 to 10 years, and he was con-

victed for a 1977 rape and armed robbery for which he received 20 years' imprisonment. On December 22, the court found defendant was a habitual criminal and, pursuant to statute, sentenced him to natural life in prison on the aggravated criminal sexual assault offense (Ill. Rev. Stat. 1987, ch. 38, par. 33B—1), and 10 years on the unlawful use of weapons offense.

Defendant first asserts the court erred in denying him his continuance to obtain counsel.

■ The right to counsel guaranteed by the sixth and fourteenth amendments of the Federal Constitution, by section 8 of article I of the Illinois Constitution of 1970, and by section 113—3 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 113—3) includes the right to be represented by counsel of one's own choice. (*People v. Green* (1969), 42 Ill. 2d 555, 557, 248 N.E.2d 116, 117.) This fundamental right to be represented by a particular attorney may not be employed as a weapon to indefinitely thwart the administration of justice or otherwise embarrass the effective prosecution of a crime. (*People v. Solomon* (1962), 24 Ill. 2d 586, 590, 182 N.E.2d 736, 739, *cert. denied* (1962), 371 U.S. 853, 9 L. Ed. 2d 87, 83 S. Ct. 94.) At what point a defendant's right to select counsel unreasonably interferes with the orderly process of judicial administration necessarily depends upon the particular facts and circumstances surrounding each case, and it is a matter which lies within the sound discretion of the trial court. *People v. Mueller* (1954), 2 Ill. 2d 311, 316, 118 N.E.2d 1, 4.

The present situation is very similar to that in *People v. Free* (1983), 112 Ill. App. 3d 449, 445 N.E.2d 529, where this court affirmed a denial of a continuance to retain counsel. In that case, counsel was appointed for defendant on December 3, 1981, and on the day of trial, March 2, 1982, defendant moved for continuance to obtain counsel, which was denied. In affirming that decision, the court observed that where there was no counsel identified as being ready, willing, and able to take over, it had held that the denial of a continuance to obtain new counsel is not a breach of discretion. (*People v. Koss* (1977), 52 Ill. App. 3d 605, 607-08, 367 N.E.2d 1040, 1041.) It also noted that while defendant was incarcerated, he had ample time to obtain other counsel, and there was no indication that the granting of a continuance would have improved defendant's ability to do so. These latter circumstances imply that defendant's request was really for purposes of delay.

■ Similarly, an analysis of the factors present in the current case establishes no abuse of discretion occurred. Defendant was repre-

sented by counsel for almost four months and at no time prior to the day of trial complained about his representation, or indicated a desire to obtain other counsel. Defendant's only evidence that he could now obtain counsel was a representation that his parents suddenly decided the day before trial they could help him. It appears defendant's father was in court at the time and, yet, made no statements to support his son's assertion. Further, defendant had no articulable reason for changing counsel other than the vague assertion that counsel could not devote 100% of his efforts to this case. This all leads to the inference that defendant's true motive was to delay the proceeding, an inference borne out by defendant's other conduct in initially refusing to change from his prison uniform to street clothes, and his desire to waive his presence from the trial. Finally, as in *Koss* and *Free*, there is no identified counsel ready, willing, and able to immediately take over the case, which further supports the court's decision in denying the requested continuance.

Defendant next asserts that the court erred by failing to admonish him of his right to proceed *pro se*. It is his position that once the court denied his motion for a continuance to obtain counsel, and he had already expressed displeasure with his appointed counsel, the court should have *sua sponte* admonished him of his right to proceed *pro se*.

■ Defendant raises this issue for the first time on appeal. Accordingly, this allegation of error is waived. (*People v. Friesland* (1985), 109 Ill. 2d 369, 374, 488 N.E.2d 261, 263.) However, even if we were to address the merits of defendant's contention, it is evident no error exists.

This court previously ruled on this question in *People v. Woodruff* (1980), 85 Ill. App. 3d 654, 660, 406 N.E.2d 1155, 1160, where we stated:

> "We hold that no error occurs when a trial court fails to advise a defendant of a right to represent himself unless that defendant has clearly and unequivocally expressed a desire to reject the assistance of counsel and to proceed to present his defense *pro se*. The manifestation of this desire must also be timely made. A defendant cannot await the eve of trial and then, hoping for a continuance, announce that he has decided to rely upon his skills rather than counsel's in presenting his defense. Such machinations cannot be used to thwart the administration of justice."

A similar decision has been reached by other courts. See *People v. Clark* (1981), 94 Ill. App. 3d 295, 297, 418 N.E.2d 891, 893-94; *People*

*v. Slaughter* (1980), 84 Ill. App. 3d 88, 93, 404 N.E.2d 1058, 1062.

In the case at bar, defendant never clearly and unequivocally expressed a desire to proceed *pro se*. Accordingly, the court was not required to advise defendant of his right to represent himself, and the absence of such an admonishment was not error.

■ Defendant next argues the court erred by refusing to accept his waiver of his right to be present for the trial. A basic right guaranteed by the sixth amendment to the United States Constitution is the accused's right to be present at every stage of his trial. (*Illinois v. Allen* (1970), 397 U.S. 337, 25 L. Ed. 2d 353, 90 S. Ct. 1057.) It is also well established that a defendant may waive this right to be present at trial. (*People v. Owens* (1984), 102 Ill. 2d 145, 157, 464 N.E.2d 252, 258, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 297, 105 S. Ct. 361; *People v. Mallett* (1964), 30 Ill. 2d 136, 142, 195 N.E.2d 687, 690.) In fact, this is codified in section 115—8 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 115—8). Thus, it is apparent the court's decision in requiring the defendant to be present during the trial, while it was based on the sound determination that it was in defendant's best interest that he remain, was erroneous.

■ However, it is not the policy of the reviewing courts to reverse a judgment of conviction merely because error has been committed, unless it appears that real justice has been denied, or that the verdict of the jury may have resulted from such error. (*People v. Tranowski* (1960), 20 Ill. 2d 11, 17, 169 N.E. 2d 347, 350, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290.) In this case, we find the error is not of such a prejudicial nature.

Defendant maintains he was prejudiced by this decision since eyewitness identification at trial is usually suggestive because the defendant sits prominently at the defense table. However, section 115—8 provides not only that a defendant may waive his right to be present but, if he does, then he may be ordered to present himself in open court for purposes of identification. Thus, defendant would still be subject to in-court identification.

Further, a review of the record establishes there was no question on the identifications. Taylor positively picked defendant out of the lineup. Ersepke identified defendant at the police station as the man she saw. D.G. picked defendant from a lineup and was 98% to 99% certain. All these identifications were made prior to the in-court identifications. Thus, any argument that defendant was prejudiced due to suggestive in-court identifications is without merit.

Defendant next argues he was denied a fair trial because the jury

was improperly instructed as to the offense of aggravated criminal sexual assault. The jury was instructed that a person commits the offense of aggravated criminal sexual assault when he commits an act of sexual penetration by the use of force or the threat of force, and he displays a dangerous weapon. Defendant acknowledges that this is the statutory language. He notes the statutory charge contains no specific mental state. (See Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(1).) He points out that section 4—3(a) of the Code (Ill. Rev. Stat. 1987, ch. 38, par. 4—3(a)) provides that, unless a crime is an absolute liability offense, a mental state of intent, knowledge, recklessness, or negligence, must be proved. Therefore, he argues that one of the mental states should have been incorporated in the jury instructions, and failure to do so has deprived him of a fair trial.

■ Our court recently determined this question in *People v. Talley* (1988), 177 Ill. App. 3d 170. While the relevant offense in *Talley* was armed robbery, the opinion equally applies to aggravated criminal sexual assault. In fact, *Talley* cites as authority *People v. Ortiz* (1987), 155 Ill. App. 3d 786, 508 N.E.2d 490, and *People v. Leonard* (1988), 171 Ill. App. 3d 380, 526 N.E.2d 397, both of which involved the offense of criminal sexual assault. The mental state was not a necessary element of the issues instruction.

Defendant asserts next that the court erred by allowing trial to proceed on improperly joined offenses. He observes the aggravated criminal sexual assault occurred on June 17, while the unlawful use of weapons offense took place on June 20. He believes this time differential should preclude these offenses from being tried together, and he was denied a fair trial when they were.

■ We initially note that this issue was first raised in defendant's post-trial motion. Failure to move for severance of separate counts prior to trial waives any allegation by the defendant that he was prejudiced by a misjoinder of offenses. (*People v. Stilson* (1930), 342 Ill. 158, 166, 174 N.E. 45, 48; *People v. Mowen* (1969), 109 Ill. App. 2d 62, 70, 248 N.E.2d 685, 689, *cert. denied* (1970), 397 U.S. 908, 25 L. Ed. 2d 89, 90 S. Ct. 905.) Even if we address the merits, it is apparent no error occurred.

■ A defendant may be placed on trial in one proceeding for separate offenses if the offenses are based on the same act or on two or more acts which are part of the same comprehensive scheme. (Ill. Rev. Stat. 1987, ch. 38, par. 111—4(a).) The trial court has substantial discretion in determining the propriety of joinder. (*People v. Harris* (1986), 147 Ill. App. 3d 891, 894, 498 N.E.2d 621, 623.) Its determination will not be reversed absent a showing of an abuse of that discre-

tion. *People v. Mikel* (1979), 73 Ill. App. 3d 21, 27, 391 N.E.2d 550, 555.

There are no precise criteria to determine whether separate offenses are part of the same comprehensive transaction. (*People v. Duncan* (1987), 115 Ill. 2d 429, 441, 505 N.E.2d 307, 312.) Among the factors to be considered are the physical and temporal proximity of the acts charged, the identity of evidence needed to demonstrate a link between the offenses, whether there was a common method in the offenses, similarities in the acts, and whether the same or similar evidence would establish the elements of the offenses. (*Duncan*, 115 Ill. 2d at 441, 505 N.E.2d at 312; *Harris*, 147 Ill. App. 3d at 894, 498 N.E.2d at 623.) We note the United States Supreme Court vacated the judgment in *Duncan (Illinois v. Duncan* (1987), 484 U.S. 806, 98 L. Ed. 2d 18, 108 S. Ct. 53) and remanded to our supreme court for further consideration. Our supreme court subsequently issued an opinion in *People v. Duncan* (1988), 124 Ill. 2d 400, 530 N.E.2d 423. The authority cited from the original *Duncan* opinion was not the subject of the vacation of judgment, nor the subject matter of the subsequent opinion.

In *Harris*, the court affirmed a decision to try two separate offenses together, finding they were part of the same transaction. There, the offenses occurred within two blocks of each other and about 31 hours apart. In each instance, the offender followed elderly women to their apartments, grabbed them around the neck, and forced them into their apartments. Both women were beaten, robbed of money, and asked about jewels. Both had their clothes removed. One was sexually assaulted, and the other was told she was too old to be assaulted. The court found the physical proximity, the common method of operation, and the common type of victim all supported the joinder of the offenses.

■ The analogy to the present case is readily apparent. Here, two college students are followed to their apartments, at which time defendant produced a knife. The knife is identified in court by both victims. One victim was forced inside and sexually assaulted. The other victim was spared that fate when a neighbor intervened. The composite prepared by the first was used to help identify the attacker of the second. The offenses occurred within 70 hours of each other. We believe the common method of operation, the proximity in time, the common type of victim, and the intertwining of the evidence concerning defendant's identification and arrest all support the offenses being prosecuted together.

Defendant's final contention is that he was improperly sentenced.

At the sentencing hearing, the State presented evidence that in 1971 defendant was convicted for rape and that he was also convicted for a 1977 rape and armed robbery. The court found that defendant was a habitual criminal and sentenced him to natural life in prison. Defendant believes the determination he was a habitual criminal is incorrect.

The habitual criminal statute (Ill. Rev. Stat. 1985, ch. 38, par. 33B—1), as it was written at the time of defendant's sentencing, provides, in part:

> "Every person who has been twice convicted in any state or federal court of an offense that contains the same elements as an offense now classified in Illinois as a Class X felony or murder, and is thereafter convicted of a Class X felony or murder, committed after the 2 prior convictions, shall be adjudged an habitual criminal."

One of the purposes of this act was to remove career rapists from society and confine them to prison. *People v. Cannady* (1987), 159 Ill. App. 3d 1086, 1089-90, 513 N.E.2d 118, 120.

Defendant maintains the State has not proved the requisite two prior Class X felonies. He observes rape is no longer a criminal offense, having been repealed by a 1984 amendment to the Code. The Code now includes the offenses of criminal sexual assault and aggravated criminal sexual assault. The former is a Class 1 felony, and the latter a Class X. Defendant argues that the acts which once constituted rape (sexual penetration by the use or threat of force) now constitute the elements of criminal sexual assault, the Class 1 felony. Therefore, he insists his 1971 rape conviction should not be considered a Class X felony for purposes of the habitual criminal statute.

This identical argument was addressed in *People v. Sims* (1987), 166 Ill. App. 3d 289, 519 N.E.2d 921. There, the court noted that the amendatory act of 1983, which repealed the offense of rape and created the offenses of criminal sexual assault and aggravated criminal sexual assault, among others (Ill. Rev. Stat. 1987, ch. 38, pars. 12—12 through 12—18), contained a savings clause. This clause provides, in part, that the abolition of any offense by this act does not affect any penalty or punishment accrued under any law in effect immediately prior to the effective date of this amendatory act. It further provides that the amendments shall only apply to those persons who commit offenses prohibited under the act after the amendatory act's effective date. (Pub. Act 83—1067, §27, eff. July 1, 1984; 1983 Ill. Laws 7251, 7306.) The court held, therefore, that a 1965 rape conviction would qualify as one of the predicate Class X felonies required under the habitual criminal statute.

■■■ We find this analysis persuasive. At the time the amendatory act went into effect, rape was a Class X felony. The savings clause makes it clear that the amendment does not affect this penalty. Accordingly, convictions for rape qualify as a predicate offense because they were either a Class X felony at the time of the conviction or, in the case of convictions entered prior to the adoption of the Class X designation, they contained the same elements as a Class X offense. In the instant case, the 1971 conviction, of which defendant complains, was appropriately considered as one of the required Class X felonies.

We also believe this analysis furthers the legislative intent. As noted, the legislature intended the habitual criminal legislation would apply to career rapists and would remove them from society (*Cannady*, 159 Ill. App. 3d at 1089-90, 513 N.E.2d at 120), a position the legislature has further solidified by its recent clarification to the habitual criminal statute, which became effective on January 1, 1988, and specifically provides the predicate offenses could be convictions for Class X felonies, *criminal sexual assault*, and murder. Ill. Rev. Stat. 1987, ch. 38, par. 33B—1.

Even if we adopt defendant's analysis, the 1971 conviction would qualify as a Class X felony. A review of that conviction establishes that defendant used a knife while committing the rape. Therefore, while defendant committed an act of sexual penetration by the use or threat of force, he used or threatened the use of a dangerous weapon. These are the elements of aggravated criminal sexual assault, which is currently a Class X felony. This qualifies the 1971 conviction as a predicate offense under the habitual criminal statute. See *Cannady*, 159 Ill. App. 3d at 1090, 513 N.E.2d at 121.

The judgment of the circuit court of Champaign County is affirmed.

Affirmed.

SPITZ and GREEN, JJ., concur.