THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CURTIS B. MITCHELL, Defendant-Appellant.

Fifth District    No. 5—88—0473

Opinion filed July 19, 1990.

Daniel M. Kirwan, of State Appellate Defender's Office, of Mt. Vernon,

and Lori L. Mosby, of State Appellate Defender's Office, of Springfield, for appellant.

John Knight, State's Attorney, of Greenville (Kenneth R. Boyle, Stephen E. Norris, and Ellen Eder Irish, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

The defendant, Curtis B. Mitchell, was charged with aggravated criminal sexual assault and armed robbery. After a jury trial the defendant was found guilty of aggravated criminal sexual assault and not guilty of armed robbery. On appeal the defendant contends that he was denied a fair trial by the admission of certain hearsay statements, by improper questioning by the State's Attorney, and by misstatements by the prosecutor during closing arguments. The defendant also argues that certain aspects of the aggravated criminal sexual assault statute violate due process. We affirm.

Since the defendant does not challenge the sufficiency of the evidence, we will relate only those portions of the evidence adduced at trial that are necessary to understanding and resolving defendant's claims of error. The victim, D.G., testified that she knew the defendant as a neighbor, and that he and another man, Winford Brown, had come by her apartment on March 17, 1988, to introduce themselves. The following afternoon the defendant and Brown returned to her apartment and fixed the antenna wire on her stereo. Around 4 p.m. D.G. asked her visitors to leave because she was going to her brother's apartment next door, where she remained until 9:45 p.m. At 9:30 that evening the defendant came to D.G.'s brother's apartment and asked her to go to a nightclub with him, but she refused. D.G. further testified that shortly after 10 p.m. the defendant returned to her apartment, wanting to talk. She allowed him to enter, and he stayed until about 10:30 p.m., when she asked him to leave because she was tired. At approximately 11:40 p.m. the defendant knocked on D.G.'s door and asked for a tape he had left in her apartment. D.G. asked the defendant to wait at the door, but he followed her inside, brandished a knife, threatened the lives of her and her children, and sexually assaulted her. D.G. also stated that defendant scratched her face with the knife and that the fingers of her left hand were cut when she tried to grab the knife. After the assault, the defendant made the victim give him the money she had in her purse.

The defendant testified that he and Winford Brown went to D.G.'s apartment on March 17 and he attempted to repair the an-

tenna wire on her stereo. As the defendant and Brown were leaving the apartment, D.G. told him to come back later. The defendant stated that he went back to D.G.'s apartment shortly after 1:30 a.m., March 18, and she and he engaged in consensual sexual intercourse. According to the defendant, later that day, when he returned to fix her stereo, D.G. asked the defendant for $150. He told her that he did not have the money. The defendant further testified that about 6:30 p.m. on March 18 he went to the home of Patty Telford to help move a piano. At approximately 9 p.m., the defendant drove with Telford, Mark Macon, and a man he knew as "Beau" to store the piano. They then returned to Telford's house, where the defendant stayed until approximately midnight. The defendant then dropped Mark Macon off and arrived home at 12:30 a.m., March 19. The defendant denied assaulting D.G. on the evening of March 18.

Lisa Davis, whom the defendant lived with, testified that she woke up between 10 and 10:30 p.m. on March 18 and the defendant was not home. The defendant came home around 10:45 p.m. and left shortly thereafter. Defendant returned around 11:30 or 11:45 p.m. and told Davis to tell anyone who came for him that he had been home all evening.

Mark Macon testified that he was with the defendant and some other people on March 18 when they helped to move the piano. He and the defendant went to Patty Telford's house while it was still light outside. They waited for a while for more help to arrive and then moved the piano to a storage shed in Highland, Illinois. Afterwards, Macon, "Beau" and the defendant got a 12-pack of beer and rode around in the country for a while. After finishing the beer, they drove back to Greenville, dropped "Beau" off at Telford's house, and then the defendant dropped Macon off at his house. During the course of the direct examination, Macon was repeatedly asked about the times of the events of that evening. He stated that he didn't know what time he and the defendant arrived at Telford's house, nor when they arrived in Highland, nor when they finished moving the piano into the storage shed, nor when they arrived back in Highland. Macon also testified that he didn't know what time the defendant dropped him off at home, although it was late. Defense counsel then asked:

"Q. You don't know any specific time, Mark?

A. Yeah, I don't know a specific time. It was somewhere between 12:00 and quarter-after, twenty-after. Because everybody at my house was sleeping and they usually go to sleep.

Q. What time do they usually go to sleep?

A. 10:30, 11:00 o'clock, 12:00 o'clock, just different hours."

Richard Koonce testified that he also helped move the piano, along with the defendant, Mark Macon, and others. He testified on direct examination that they arrived in Highland around 9 p.m., although later, he stated that they were finished moving the piano by 9 p.m. Koonce testified that he arrived back at Telford's house around 10 p.m. and stayed there until 11 p.m. The defendant and Macon got to Telford's shortly after he did and left 5 or 10 minutes later. On cross-examination Koonce agreed that he could have arrived back in Greenville by 9:15 or 9:30 p.m, but that he really didn't know.

John ("Beau") Gillin testified that he had helped move the piano and that he rode back to Greenville with the defendant and Macon. He stated that he didn't know what time he got back to Greenville. On cross-examination, Gillin agreed that he could have arrived in Greenville between 8:30 and 9 p.m., but he did not know.

Sergeant Paul Omelson of the Greenville police department testified that at approximately 12:41 a.m. on March 19, 1988, he was dispatched to investigate a possible armed robbery. He was informed that the suspect, possibly named Curtis, had left the scene on foot. Upon arriving at the scene, Omelson met J.R., the victim's brother, who told him that a short black man he knew only as Curtis had raped, robbed and cut his sister. J.R. pointed out the apartment in which he believed the defendant lived. Defense counsel's hearsay objection to J.R.'s statements was overruled.

Dr. Thomas Dawdy testified that he examined the victim after she was brought to the hospital emergency room. Dawdy testified over objection that D.G. told him that a man came to her apartment and told her that if she wouldn't go out with him, he would take what he wanted. The man forced her at knife-point to have oral and vaginal sex and threatened to kill her if she told anyone. He then demanded money from her and left the apartment. Dawdy further testified that his examination of the victim revealed scratches on her forehead and chin, an abrasion on her lip, and two cuts on her left hand which required suturing.

In addition to the above-related testimony, there was evidence presented concerning the presence of semen on the victim and her clothing which could have come from the defendant, as well as evidence of a bloodstain on the defendant's jeans which was not the defendant's blood, but could have come from the victim. Furthermore, some clothing taken by the police from the closet of the bedroom where the defendant slept matched the description given by the victim of clothing worn by the defendant during the assault.

■ The State contends at the outset that the defendant has waived any errors which he claims occurred at trial by either failing to object or by failing to include them in his post-trial motion. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) We agree that the defendant has failed to properly preserve the alleged errors; nevertheless, we will examine defendant's contentions to determine whether they rise to the level of plain error (107 Ill. 2d R. 615(a)).

■ ■ The defendant first contends that it was error to allow Sergeant Omelson to testify to the hearsay identification of the defendant by the victim's brother, J.R. The State argues that Sergeant Omelson's testimony was not offered for the truth of the matter asserted (*i.e.*, that a short black man had attacked and robbed J.R.'s sister) but was instead merely an explanation of the officer's investigatory procedure. This was necessary, according to the State, to explain why Omelson went to the defendant's apartment after arriving on the scene instead of immediately going to the victim's apartment. Testimony regarding investigatory procedures is not hearsay where the purpose of the testimony is limited to showing why the police officer acted as he did. (*People v. Brown* (1983), 113 Ill. App. 3d 625, 632, 447 N.E.2d 1011, 1016.) It would appear that while the testimony of Sergeant Omelson that J.R. pointed out the defendant's apartment was therefore not hearsay, we question whether J.R.'s description of the defendant as the assailant and the fact that he knew him as Curtis fall within the ambit of the hearsay exception. Nevertheless, even if the statements were hearsay, we find no reversible error. The admission of hearsay identification testimony constitutes plain error only where it serves as a substitute for courtroom identification or is used to strengthen and corroborate a weak identification. Such evidence is harmless error where it is merely cumulative or is supported by a positive identification and other corroborative circumstances. (*People v. Miles* (1988), 176 Ill. App. 3d 758, 764, 531 N.E.2d 891, 894; *People v. Coleman* (1974), 17 Ill. App. 3d 421, 428, 308 N.E.2d 364, 369.) In the instant case, the victim's identification of the defendant was clear and unequivocal; indeed, defendant admits in his brief that identification was not at issue. We find no plain error.

■ The defendant next contends that the testimony of Dr. Dawdy concerning the victim's account of the assault was inadmissible. The defendant acknowledges that section 115—13 of the Code of Criminal Procedure of 1963 provides that statements by victims of sex offenses to medical personnel for purposes of diagnosis and treatment are admissible. That section provides:

"In a prosecution for violation of Section 12—13, 12—14, 12—15 or 12—16 of the 'Criminal Code of 1961', statements made by the victim to medical personnel for purposes of medical diagnosis or treatment including descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment shall be admitted as an exception to the hearsay rule." Ill. Rev. Stat. 1989, ch. 38, par. 115—13.

■ Defendant argues, however, that the testimony regarding statements made by the assailant as he entered the apartment and those concerning the armed robbery exceeded the statutory hearsay exception. We agree with the defendant that the testimony about the statement made by the assailant as he entered the apartment (that if she would not go out with him he would take what he wanted) was not "reasonably pertinent to diagnosis or treatment." (Ill. Rev. Stat. 1989, ch. 38, par. 115—13.) We do not believe, however, that the defendant was sufficiently prejudiced by the admission of this statement to overcome the waiver rule. (*Cf. People v. Gant* (1974), 58 Ill. 2d 178, 181-86, 317 N.E.2d 564, 567-69 (testimony by treating doctor that victim told him assailant threatened her and that she knew him was admissible).) Similarly, while the testimony that the assailant demanded money from the victim after the attack was also not pertinent to diagnosis or treatment, we find no plain error, particularly in view of the fact that the defendant was acquitted of the armed robbery charge.

The defendant next contends that the prosecutor improperly questioned him concerning the veracity of the State's witnesses. During cross-examination of the defendant the following exchange occurred:

"Q. [State's Attorney]: Why did you tell Lisa Davis when you got home that night to lie about where you had been?

A. [Defendant]: I did not tell Lisa Davis to lie about where I have been.

Q. She's lying about that?

A. Apparently she is.

* * *

Q. What about these black underwear with the zippers in front? Do you own a pair of those?

A. No, I don't.

Q. You heard the victim testify you had a pair of those on?

A. Yeah, I remember hearing something about it.

Q. Lisa Davis, whom I assume slept with [*sic*] regularly for

the last seven or eight months, she said you had a pair of those?

A. I don't have a pair.

Q. Well, I guess she's lying, isn't she?

A. I guess she is. I don't have a pair.

Q. And, the victim is lying, aren't they—isn't she?

A. Yes, they are.

Q. Really, everybody that's testified so far is lying, aren't they?

A. Apparently they don't know what they're talking about."

■ This court has repeatedly stated that it is improper to question a defendant regarding his opinion of the truthfulness of other witnesses because such questions intrude on the jury's function of determining the credibility of the witnesses. (See *People v. Hopkins* (1982), 107 Ill. App. 3d 422, 426, 437 N.E.2d 722, 726; *People v. Dowd* (1981), 101 Ill. App. 3d 830, 844, 428 N.E.2d 894, 904; *People v. Best* (1981), 97 Ill. App. 3d 1083, 1086-87, 424 N.E.2d 29, 32.) While the questioning here was improper, we do not find that it rises to the level of plain error in view of the strong evidence of defendant's guilt. See *People v. Richardson* (1985), 139 Ill. App. 3d 598, 601, 487 N.E.2d 716, 718; *Hopkins*, 107 Ill. App. 3d 422, 437 N.E.2d 722; *Dowd*, 101 Ill. App. 3d 830, 428 N.E.2d 894; *Best*, 97 Ill. App. 3d 1083, 424 N.E.2d 29; *People v. Foster* (1980), 80 Ill. App. 3d 990, 994, 400 N.E.2d 462, 466; *People v. White* (1977), 52 Ill. App. 3d 517, 521-22, 367 N.E.2d 727, 732.

The defendant next refers to four statements made by the prosecutor during the course of his closing argument which the defendant characterizes as prosecutorial misconduct. The defendant first complains that two statements, set forth below, misstated the evidence with regard to the defendant's alibi defense.

"I was going to talk to you about Mark Macon, the nephew of Mitchell's brother-in-law. He never mentioned a time. He couldn't come up with any times.

* * *

And, I don't remember all the times he [the defendant] recited, but he didn't get done at Patty Telford's 'till 1:00 in the morning or something, and Officer Omelson got to his house at 12:41 a.m."

■ The defendant notes that Mark Macon stated that the defendant dropped him off at home between midnight and 12:20 a.m., and argues that the prosecutor inaccurately portrayed Macon as a witness who was unable to remember sufficient details to corroborate the

defendant's alibi defense. The record shows that Macon was repeatedly asked about the times of various events of March 18 and was unable to remember. Macon finally stated that he remembered that the defendant dropped him off between 12 and 12:20 because everyone at Macon's house was asleep and they usually went to sleep at "10:30, 11:00, 12:00, just different hours." Therefore, while the prosecutor's statement that Macon "never mentioned a time" was inaccurate, we believe that it can be viewed as a general comment on the witness' imprecise memory. We find no plain error.

The prosecution's statement that the defendant said he didn't leave Telford's house until 1 a.m. was also inaccurate, but was introduced with the phrase "I don't remember all the times he recited" and was further qualified when the prosecutor said that the defendant left Telford's at "1:00 in the morning or something." Moreover, at the beginning of his closing argument the prosecutor cautioned the jury to disregard any mistakes he might make recounting the evidence and to rely on their memories.

> "Closing arguments are similar to our opening statement. The attorneys both get a chance to tell you what we feel we have proven in this case. It's not evidence. If I say something that's inconsistent with what you heard from the witness stand, go on your own memories, disregard what I say. The same way with Mr. Craig. We are going to argue the evidence, but there's been a lot of evidence and we may make some mistakes. Please forgive us, rely on your memories."

■ Such a statement does not, of course, act as a general disclaimer which allows an attorney to distort or misrepresent the evidence; we will not hesitate in reversing a conviction where a prosecutor's remarks deprive the defendant of a fair trial. (See, *e.g., People v. Nevitt* (1988), 174 Ill. App. 3d 326, 349-50, 528 N.E.2d 307, 324; *People v. Linscott* (1987), 159 Ill. App. 3d 71, 511 N.E.2d 1303, *appeal allowed* (1987), 117 Ill. 2d 549, 517 N.E.2d 1091.) A prosecutor is allowed wide latitude in closing arguments, however (*People v. Marshall* (1988), 165 Ill. App. 3d 968, 979, 521 N.E.2d 538, 545), and even improper comments do not constitute reversible error unless they result in substantial prejudice (*People v. Collins* (1985), 106 Ill. 2d 237, 276, 478 N.E.2d 267, 284, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267). We do not believe that the prosecutor's equivocal statement concerning the time the defendant left Telford's house resulted in substantial prejudice. See *People v. Pauley* (1983), 117 Ill. App. 3d 486, 494-95, 453 N.E.2d 958, 964.

The defendant next complains of a remark made by the prosecu-

tor while he was recounting the testimony of Dr. Dawdy, who examined the victim after the assault. After relating to the jury that semen had been found on the victim's panties and that, according to the defendant, the victim had been wearing different panties when they engaged in consensual sexual relations, the prosecutor asked: "So, how does he [the defendant] explain the presence of sperm on those panties you have here that the Doctor took off her that day?" Defendant contends that this statement misinformed the jury that the defendant had the burden of disproving the State's evidence. We disagree.

■■ The theme of the prosecutor's closing argument was that the jury should view the testimony and evidence as pieces of a puzzle that would match either the defendant's or the victim's version of what happened. The prosecutor would remind the jury of a particular item of evidence or a particular witness' testimony and rhetorically ask whether that evidence matched the victim's or the defendant's "picture" of the events of March 18. Viewed in the context of the entire closing argument, the question posed by the prosecutor was not an attempt to shift the burden of proof to defendant, but was rather meant to point out that such evidence was inconsistent with the defendant's version of the facts. A prosecutor may properly comment on the strength of the evidence (*People v. Emerson* (1987), 122 Ill. 2d 411, 434, 522 N.E.2d 1109, 1118, *cert. denied* (1988), 488 U.S. 900, 102 L. Ed. 2d 235, 109 S. Ct. 246), and remarks which merely question the validity and believability of defendant's alibi are not improper (*People v. Uzelac* (1988), 179 Ill. App. 3d 395, 405, 534 N.E.2d 1250, 1256). The situation in this case is far removed from that in *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734, cited by defendant, where the court reversed a defendant's conviction because the prosecutor repeatedly told the jury that the defendant had failed to prove he was not guilty. We find no error.

■■ The last statement which the defendant cites as error occurred during the prosecutor's rebuttal of the defendant's closing argument. The State's Attorney stated:

> "And, ladies and gentlemen, I submit to you that every one of you heard her testimony, and you heard her difficulty in getting it out. She has visible scarring of her mind over this whole thing, and she has visible bruising of her memory. And, those things are just as traumatic to that victim as anything that Doctor could have seen that night. And, don't you for a minute in your jury room forget it."

The defendant contends that this statement improperly appealed

to the jury's emotions by inviting them to consider the impact of the crime on the victim. We disagree. Upon examining the record it is clear that the statement that defendant complains of was invited by the remarks of defense counsel during his closing argument. Defense counsel argued:

> "We want to notice also that the Doctor left out some things in his testimony. And, by your observation you could have noticed some things. [D.G.] was not bruised anywhere. There was no testimony. All that veracity [sic] and all that hassle, no bruises, no marks. There were no scars pointed out to you on the witness stand about [sic] the severity of cuts."

On rebuttal, the prosecutor stated, immediately prior to the remarks of which the defendant complains:

> "Then let's talk just a minute about Dr. Dawdy's testimony with respect to [D.G.]. Ladies and gentlemen, it is ludicrous to even mention that [D.G.] didn't have any visible bruises or show you any scars. You read those instructions all you want. The State does not have to prove he left a scar on the victim, or that he visibly bruised her. That's not what he's charged with, and the State does not have to prove that.
>
> Ladies and gentlemen, the Doctor's testimony was very clear. His penis left the trail, and his knife left a trail. Just because those weren't still visible when she sat here in the courtroom means nothing in this case."

A defendant may not claim prejudice from comments which were provoked or invited by the arguments of defense counsel. (*People v. Richardson* (1988), 123 Ill. 2d 322, 356, 528 N.E.2d 612, 625, *cert. denied* (1989), 489 U.S. 1100, 103 L. Ed. 2d 943, 109 S. Ct. 1577; *People v. Piscotti* (1985), 136 Ill. App. 3d 420, 441, 483 N.E.2d 363, 378.) Moreover, the prosecutor may comment upon the credibility of the witnesses (*Richardson*, 123 Ill. 2d at 356, 528 N.E.2d at 625; *People v. Tannahill* (1987), 152 Ill. App. 3d 882, 888, 504 N.E.2d 1283, 1287-88), the violence of the crime and its evil results (*People v. Albanese* (1984), 104 Ill. 2d 504, 521, 473 N.E.2d 1246, 1253; *Piscotti*, 136 Ill. App. 3d at 442-43, 483 N.E.2d at 379), and the trauma suffered by the victim (*Tannahill*, 152 Ill. App. 3d at 888, 504 N.E.2d at 1288). We find no error.

■ Defendant also argues that even if any single error does not require reversal, their cumulative effect denied him a fair trial. We have carefully reviewed the record and find that while the defendant did not receive a perfect trial, he did receive a fair one.

Finally, defendant argues that his right to due process was vio-

lated because: (1) the jury was not instructed on the mental state necessary to convict a defendant of aggravated criminal sexual assault; (2) the aggravated criminal sexual assault statute is overbroad because it fails to limit its reach to those acts done for the purpose of sexual gratification or arousal and thereby punishes innocent as well as culpable behavior; and (3) the aggravated criminal sexual assault statute requires no mental state while the less culpable offense of aggravated criminal sexual abuse requires an intentional or knowing touching done for the purpose of sexual gratification or arousal.

■■■ The defendant's argument that failing to instruct the jury regarding the mental state necessary to find him guilty of aggravated criminal sexual assault violated his right to due process is unpersuasive, particularly since he did not tender such an instruction. Criminal sexual assault is a general intent offense in which the mental state of intent, knowledge, or recklessness is implied. (*People v. Terrell* (1989), 132 Ill. 2d 178, 207-11, 547 N.E.2d 145, 157-59; *People v. Williams* (1989), 191 Ill. App. 3d 269, 275, 547 N.E.2d 608, 612.) Failing to include the implied mental state in the jury instructions defining criminal sexual assault is not error. (*Williams*, 191 Ill. App. 3d at 275, 547 N.E.2d at 612-13; *People v. Avila* (1989), 180 Ill. App. 3d 345, 353, 535 N.E.2d 1027, 1032; *People v. Casey* (1989), 179 Ill. App. 3d 737, 743, 534 N.E.2d 1036, 1039-40; *People v. Terry* (1988), 177 Ill. App. 3d 185, 192-93, 532 N.E.2d 568, 574; *People v. Leonard* (1988), 171 Ill. App. 3d 380, 384-85, 526 N.E.2d 397, 400, *cert. denied* (1989), 490 U.S. 1008, 104 L. Ed. 2d 162, 109 S. Ct. 1647; *People v. Ortiz* (1987), 155 Ill. App. 3d 786, 791-92, 508 N.E.2d 490, 494; see also *People v. Avant* (1989), 178 Ill. App. 3d 139, 532 N.E.2d 1141.) With regard to the defendant's two remaining contentions, we note that these arguments have previously been considered and rejected both by this court (*People v. Ramsey* (1989), 190 Ill. App. 3d 723, 546 N.E.2d 1108) and by the Illinois Supreme Court (*People v. Terrell* (1989), 132 Ill. 2d 178, 547 N.E.2d 145). Accordingly, we find no error.

For the above-stated reasons, we affirm the defendant's conviction for aggravated criminal sexual assault.

Affirmed.

RARICK and HOWERTON, JJ., concur.