2022 IL App (2d) 210422-U
No. 2-21-0422
Order filed November 28, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-CF-1239 |
| | ) | |
| DWAYNE DYKES, | ) | Honorable |
| | ) | Jeffrey MacKay, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Viewing the evidence in the light most favorable to the State, any reasonable trier of fact could have found the defendant guilty of aggravated domestic battery when the evidence supported a finding that defendant and victim had children in common and victim suffered great bodily harm. Defendant did not receive ineffective assistance of counsel.

¶ 2    Defendant, Dwayne Dykes, appeals the judgment of the circuit court of Du Page County finding him guilty of aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2016)). Defendant contends that the state failed to prove that he and the victim had a family relationship, or that the victim suffered great bodily harm. Defendant also raises an ineffective assistance of sentencing

counsel claim for failing to present evidence in mitigation of abuse and neglect during defendant's tumultuous childhood. Because the evidence was sufficient to prove defendant and victim had children in common, the victim had a broken nose in two places, and because the trial court considered factors in mitigation during the sentencing hearing, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was charged by indictment with one count of aggravated domestic battery, two counts of domestic battery, resisting a peace officer and obstructing identification. He opted for a bench trial.

¶ 5     Kathleen Nell, the front desk clerk of the Champagne Lodge, testified that shortly after 8:30 p.m. on June 21, 2017, she checked-in a guest, Shakia Vaughn (Shakia), and made a copy of her driver's license and debit card. After Shakia was checked-in, she exited the front door of the lobby. About five minutes later, a man entered the lobby and asked Nell what room Shakia was in. Nell identified defendant as the man she encountered that night. Nell told defendant she could not give him Shakia's room number and could not call the room, and that was the end of their conversation.

¶ 6     At approximately 9:00 p.m., Nell was checking-in another guest when she heard a muffled cry or yell coming from the courtyard, which is to the backside of the lobby. She went to the courtyard as soon as she finished with the guest and observed Shakia laying on the ground, on her stomach, with her face pointing away from Nell's location. Defendant was leaning over Shakia yelling. Nell asked if Shakia was okay, and defendant responded for her to "mind [her] own f****** business." Nell then returned to the lobby and called 911.

¶ 7     From the front desk, Nell viewed surveillance video from the security cameras that operated in the lobby and the outside courtyard. She observed defendant leaning over Shakia

before pacing around and attempting to drag Shakia away. Nell went back and forth from the front desk to the courtyard door hoping to deter defendant while on the phone with 911. Nell observed Shakia unresponsive and defendant acting agitated and aggressive. Nell locked all the doors except for one in case Shakia managed to get inside and she could lock defendant out of the building. When Shakia made it inside, Nell locked the doors and noticed that Shakia's nose looked swollen. There was blood running from her nose onto her white shirt. Shakia appeared very dazed, had a blank look on her face, and was barely responsive to her surroundings. Shakia remained in the lobby until the police arrived. Nell did not smell alcohol and had not sold Shakia any alcohol. Nell did not see defendant hit Shakia, and she did not see how she got to the ground.

¶ 8     Dr. Peter Hrabski, a radiologist, gave expert testimony. On June 21, 2017, he received the X-rays of Shakia's nose. He saw at least two acute fractures of the nasal bones. He defined "acute" as indicating that there had not been time for healing, and that there was no new bone forming or bony union. He also saw "overlap," meaning a displacement of the bones, which indicated a more severe injury than a hairline fracture. Hrabski stated that it takes a certain impact to break a bone, and that it was a significant injury to Shakia that broke both nasal bones. He commented that incidental trauma would not be significant enough to cause such a break. Hrabski stated it would often take six to eight weeks for this type of injury to fully heal but could take up to three months.

¶ 9     On cross examination, Hrabski was presented with Shakia's medical record from January 2, 2017, that identified acute nasal bone fractures. Hrabski explained that the prior injury from January would be considered a "chronic" injury and that there can be an "acute" injury that occurs over that chronic injury.

¶ 10    Alex Alge testified that she dated defendant from 2009 to 2010. On January 26, 2010, Alge called defendant after she got off work at around 11:30 p.m. and asked him to meet at her condo

with her car keys. Alge brought a friend back to her building because she was afraid and anticipated needing the friend to call the police. She left the friend in the lobby and went upstairs to her condo on the third floor where she encountered defendant. She then returned to the lobby and gave her friend the keys to her condo and asked her to call the police. Alge then returned upstairs to talk to defendant. She told him she wanted him to move his belongings out and to return her car and condo keys. Defendant got very angry and punched Alge in the face twice. He then knocked her to the ground and strangled her. Defendant stopped strangling Alge when police opened the door and announced themselves. Defendant ran to the door and held it shut and then wrapped a phone charger around the door handle and lock. Defendant then exited the condo off the balcony. Alge spoke with the police and an ambulance came. Defendant was found guilty of aggravated domestic battery related to the incident.

¶ 11    Du Page County Sergeant Donald Krause responded to the Champagne Lodge. When he arrived, he spoke to Kathleen Nell who directed him to the courtyard. In the courtyard he observed a woman lying in the grass and defendant standing several feet away looking down at her. Krause, dressed in uniform, shined his flashlight on defendant before he started running away. Krause chased defendant, identified himself as police, and continued the chase a minute or two around the building. Krause pursued defendant to the front lobby of the building, where defendant met another police officer from Burr Ridge. At that point defendant acquiesced and allowed Krause to detain him.

¶ 12    Krause spoke to Shakia that night. He observed that she had a very swollen nose, had dried blood on her nose and face, and her white T-shirt had a lot of blood on it. Shakia appeared very upset. She did not smell of alcohol.

¶ 13    Krause then spoke to defendant who incorrectly identified himself as "Dwayne T. Vaughn." Defendant told Krause he came to the Champagne Lodge with Shakia, then parked in the back parking lot because he did not want his "real girlfriend" to know that he was there with Shakia. Defendant told Krause he did not punch Shakia and that she "is a drunk" and fell in the grass.

¶ 14    Burr Ridge Detective Mike Cervenka was dispatched to the Champagne Lodge on June 21, 2017, to assist the Du Page County officers. Cervenka first saw defendant running from around the building. He was also approached in the lobby of the hotel by a woman who appeared to be crying and "hysterical." The woman had blood on her face and shirt.

¶ 15    Du Page County Deputy Tyler Fry testified that on June 21, 2017, he was called to assist the investigation of a domestic battery that involved defendant and Shakia. He arrived at Adventist Hinsdale Hospital where he took photographs of Shakia's injuries and took a written statement.

¶ 16    Dalois Vaughn[1], Shakia Vaughn's mother, testified that Shakia has four children. Defendant is the father of two, D.D. and B.D. Dalois was present at the birth of D.D. Pictures that she took in the hospital on that day of defendant, Shakia, and D.D., and of only defendant and D.D., were entered into evidence. Dalois met defendant a few months before D.D. was born. She continued to see him on occasion with her daughter, twice in the summer of 2017, including June 17, 2017, a few days before the incident in this case. She observed no swelling, bruising, cuts, deformity, or misalignment in Shakia's nose on that date. Dalois described a tattoo that Shakia has which reads "Wayne" which is a nickname for defendant. Dalois also stated that defendant had signed the birth certificates of the two children, and both children have the same last name as

---

[1] This name alternatively appeared as Valois Vaughn in the court transcript.

defendant. The state entered birth certificates for D.D. and B.D. into evidence as certified public documents.

¶ 17    Dalois listened to exhibits which were recordings of phone calls from jail. Dalois identified the parties on the recording as defendant and her daughter, Shakia. During one phone call, defendant commented to Shakia that, "they don't know we got kids or nothing."

¶ 18    Du Page County Commander Mark Boggs testified that he was the administrator of the phone system at the jail and that he had worked with the system for more than ten years. The jail assigns a unique individual ID number and PIN to each inmate to use the phones. The calls are recorded and stored as digital files on a local server. Recordings of the calls can be searched by inmate name and by the outbound phone number called. According to the record of a search presented to Boggs, defendant's name dialed the same number twice from jail on June 22, and 23, 2017. There were no issues with the operation of the telephones in June of 2017.

¶ 19    Defendant was found guilty of aggravated domestic battery and resisting a peace officer. He was sentenced to 19 years in the Illinois Department of corrections on the aggravated domestic battery, to be served concurrently with the 12-month sentence for resisting.

¶ 20                                    II. ANALYSIS

¶ 21    On appeal, defendant contends that there was insufficient evidence to prove him guilty of aggravated domestic battery because the state failed to prove (1) that he was in a family relationship with the victim, Shakia Vaughn, and (2) that Shakia suffered great bodily harm. Defendant further contends that he received ineffective assistance of counsel when evidence of his traumatic childhood was not offered in mitigation.

¶ 22    Pursuant to Section 5/12-3.2(a) of the Criminal Code of 2016 (Criminal Code) (720 ILCS 5/12-3.2(a) (2016)):

"(a) A Person commits domestic battery if he or she knowingly without legal justification by any means:

(1) Causes bodily harm to any family or household member;

(2) Makes physical contact of an insulting or provoking nature with any family or household member."

¶ 23    Section 5/12-3.3(a) of the Criminal Code provides that:

"(a) A person who, in committing a domestic battery, knowingly causes great bodily harm, or permanent disability or disfigurement commits aggravated domestic battery."

¶ 24    When reviewing a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Furthermore, "[t]he weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). A reviewing court will not substitute its judgment for that of the trier of fact regarding the weight of the evidence and the credibility of the witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48. "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 25    To defendant's first contention, we look to the statutory definition of "family or household members." Pursuant to 720 ILCS 5/12-0.1, family or household members include, "***persons who have or allegedly have a child in common***" and "***persons who have or have had a

dating or engagement relationship***." The trial court found Dalois Vaughn to be a credible witness. Her testimony that defendant is the father of two of Shakia's children is supported by his signature on their birth certificates, his presence at the hospital for D.D.'s birth, and his statement to Shakia "they don't know we got kids or nothing." Dalois saw defendant with Shakia on several occasions over a span of years and can identify his voice. Based on that identification, the record establishes that defendant himself remarked to Shakia "they don't know we got kids or nothing." Additionally, we can infer from Sergeant Krause's testimony that defendant commented he did not want his "real girlfriend" to know he was with Shakia, that he and Shakia have had or currently have a dating relationship, which further establishes the "family or household member" relationship. A rational trier of fact reasonably could have found that defendant and Shakia had a "household or family member" relationship.

¶ 26    Turning to defendant's second contention that the state did not prove Shakia suffered great bodily injury, we look to the nature and extent of the injury. " 'The term "great bodily injury," *** is not susceptible of a precise legal definition but it is an injury of a graver and more serious character than an ordinary battery.' " *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 69 (quoting *People v. Costello*, 95 Ill. App. 3d 680, 684 (1981)). "Whether the victim's injuries rise to the level of great bodily harm is a question for the trier of fact." *People v. Garry*, 323 Ill. App. 3d 292, 297 (2001). Again, we will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that we are left with a reasonable doubt as to defendant's guilt.

¶ 27    The trial court determined that Kathleen Nell and Dr. Peter Hrabski both testified credibly. Nell called 911 when she noticed Shakia lying on the ground in the courtyard with defendant standing over her because she was scared for Shakia's and her own safety. She noted the blood

running down Shakia's face, the swelling to her nose, and her disoriented manner, all things that did not exist when Shakia checked-in that evening.

¶ 28    Then, based on Dr. Hrabski's credible expert testimony as a radiologist, he observed from Shakia's X-rays that there was soft tissue swelling and her nose was broken in two places. He classified this as an "acute" injury meaning it showed no indication of healing. When confronted with evidence that Shakia had a broken nose in January of 2017, Hrabski explained the June injury could be an acute injury *over* a "chronic" injury, or one that had occurred in the past and showed signs of healing. Defendant contends that Hrabski was somewhat inconclusive with his interpretation of whether the June scans showed an acute injury once Hrabski learned of the January injury. However, the record reflects that Hrabski explained how the pattern of an acute injury differs from a chronic injury, and that while he could not tell if there had been a chronic injury based on the X-rays he had before him, he could say that the injury he observed on the X-ray from June 21, 2017, was acute. Hrabski's testimony that it would take a "certain impact" to break bone, that Shakia had a significant injury, and that "incidental trauma" would not fracture both nasal bones, supports the finding that Shakia suffered great bodily harm.

¶ 29    Finally, the state entered two surveillance video recordings, Exhibits 7A and 7B, from that night at the Champagne Lodge. Kathleen Nell identified the people in the video as Shakia and defendant. The video in 7B shows defendant punching Shakia with such force that she is leveled to the ground. Defendant then kicks Shakia and attempts to drag her body. Photographs of her injuries were taken, and she was hospitalized. Courts of review have previously found other occurrences of physical attacks to constitute great bodily harm. See *People v. Anderson*, 2017 IL App (2d) 160573-U, ¶ 18 (upholding finding of great bodily harm when evidence showed that defendant hit victim at least once in the head with a stainless-steel pan, causing him to bleed

significantly and to momentarily lose his vision.); *People v. Cross*, 84 Ill. App. 3d 868, 872 (1980) ("Certainly, striking the victim on the head with a lead pipe may be properly construed as inflicting great bodily harm."); *People v. Carmack*, 50 Ill. App. 3d 983, 985-86 (1977) (the jury's finding of great bodily harm was affirmed where the victim was struck by a wooden stick or club and there was a hematoma behind his ear, bruising about his right eye, swelling on the back of his neck, and a scalp laceration that would have required stitches had he sought immediate medical attention). Therefore, reviewing the evidence presented, we conclude that a rational trier of fact reasonably could have found that defendant inflicted great bodily harm upon Shakia.

¶ 30    We will now address defendant's contention that his sentence of 19 years was excessive, and he received ineffective assistance of counsel. Defendant was found guilty after a bench trial of one count of aggravated domestic battery, a Class 2 felony; two counts of domestic battery, a Class 4 felony; and one count of resisting a peace officer, a Class A misdemeanor. Counts II and III merged into Count I, for which defendant was eligible for Class X sentencing based on section 5/5-4.5-95(b) of the Unified Code of Corrections (the Code) (2016) on prior felony convictions from 1996 and 2010. Pursuant to Section 5/5-4.5-25 of the Code, defendant was subject to a sentence of 6 to 30 years, and his 19-year sentence falls within that range.

¶ 31    A sentencing determination will not be disturbed absent an abuse of discretion. *People v. Stacey,* 193 Ill. 2d 203, 209-10 (2000). Sentences that fall within the permissible statutory range may be deemed to be the result of an abuse of discretion only where they are "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Id.* at 210. Defendant contends that his sentencing counsel failed to conduct a thorough mitigation investigation and he is thus subject to a harsher sentence than he would have received had family members given evidence of his violent and traumatic upbringing. However, defendant's own

statement in allocution addressed many of the same sentiments that were provided via affidavit from his family members. The trial court heard and considered substantial evidence in mitigation including abuse and neglect as a boy, a tumultuous upbringing living between his mother, aunts, and group homes due to Department of Children and Family Services' involvement, exposure to gang violence, drug abuse, and the loss of a young son to gun violence.

¶ 32    To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient, and that the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668 (1984). A deficient performance is one so objectively unreasonable under prevailing professional norms that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. Here, defendant's counsel did investigate mitigating evidence, and presented defendant's friends and co-workers at the sentencing hearing who testified to his rehabilitative potential, work ethic, and value to the community. And as previously stated, defendant provided details of his traumatic young life and gave context for the way his path in life has unfolded. The trial court considered defendant's past. The trial court also considered the defendant's substantial criminal history, including a history of violence against women and domestic battery. Nothing in the affidavits provided by a sister, an aunt, and defendant's father provided appreciably new information. Because of this, we do not find that the scope of the evidence provided in mitigation was deficient. As defendant has failed to meet the first prong under *Strickland,* we need not address whether defendant was prejudiced by counsel's performance.

¶ 33                                III. CONCLUSION

¶ 34    For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 35    Affirmed.